**IN THE UNITED STATES COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BOBBIE GREENE, | ) |
| | ) |
| DANA ALZOUMA, | ) |
| | ) |
| and | )     Civil Action No. 1:25-cv-04217 |
| | ) |
| MONICA CAMBREL,[1] | )     DATE: December 3, 2025 |
| | ) |
|     Plaintiffs, | ) |
| v. | ) |
| | ) |
| UNITED STATES AGENCY FOR INTERNATIONAL | ) |
| DEVELOPMENT, | ) |
|     1300 Pennsylvania Ave. NW, | ) |
|     Washington, D.C. 2004, | ) |
| | ) |
| UNITED STATES DEPARTMENT OF STATE, | ) |
|     2201 C Street NW, | ) |
|     Washington, D.C. 20520, | ) |
| | ) |
| JEREMY LEWIN, the Deputy Administrator | ) |
| and Chief Operating Officer of the United States | ) |
| Agency for International Development, | ) |
|     2201 C Street NW, | ) |
|     Washington, D.C. 20004, | ) |
| | ) |
| MARCO RUBIO, Secretary of State, | ) |
|     2201 C Street NW, | ) |
|     Washington, D.C. 20520, | ) |
| | ) |
| OFFICE OF MANAGEMENT AND BUDGET, | ) |
|     725 17TH Street NW, | ) |
|     Washington, D.C. 20503, | ) |
| | ) |
| RUSSELL T. VOUGHT, Director of the U.S. Office of | ) |
| Management and Budget and USAID Administrator, | ) |
|     725 17th Street NW, | ) |
|     Washington, D.C. 20503, | ) |

---

[1] *See* sealed notice concurrently filed herewith for additional information regarding Plaintiffs as required by Local Civil Rule 5.1(c)(1).

|                                              |     |
|----------------------------------------------|-----|
| UNITED STATES OFFICE OF PERSONNEL            | )   |
| MANAGEMENT,                                  | )   |
|     1900 E Street, NW,   | )   |
|     Washington, D.C. 20415, | ) |
|                                              | )   |
| SCOTT KUPOR, Director of U.S. Office of Personnel | ) |
| Management,                                  | )   |
|     1900 E Street, NW,   | )   |
|     Washington, D.C. 20415, | ) |
|                                              | )   |
| UNITED STATES DEPARTMENT OF                  | )   |
| GOVERNMENT EFFICIENCY,                       | )   |
|     736 Jackson Place, N.W., | ) |
|     Washington, D.C. 20503, | ) |
|                                              | )   |
| AMY GLEASON, the Acting Administrator of DOGE | )  |
| Services,                                    | )   |
|     736 Jackson Place, N.W., | ) |
|     Washington, D.C. 20503, | ) |
|                                              | )   |
|     Defendants.          |     |

## **COMPLAINT**

## I.    **INTRODUCTION**

Plaintiffs were dedicated and respected employees of the United States Agency for International Development ("USAID"). They performed the duties assigned to them by the Agency, which included the advancement of policy objectives that comported with well-established obligations under equal employment and civil rights laws and regulations. Plaintiffs committed no misconduct, had no performance deficiencies, and never expressed any overtly political or ideological point of view in the workplace.

Yet within days of the Trump Administration coming to power, they were removed from their workplace for the sin of supporting policies that advanced "DEI" or "DEIA" functions. The nature of these functions has never been concretely identified. In reality, the Plaintiffs were

involved in outreach programs that ensured compliance with various federal civil rights laws, regulations, and policies designed to ensure a federal workforce that worked with members of classes protected under current law, including women, minorities and the disabled.

Plaintiffs Dana Alzouma, Bobbie Greene, and Monica Cambrel, lost their employment without any due process of law. They were fired because persons who became in charge of USAID after January 20, 2025, claimed their Agency was an ideological Fifth Column and presumed that the employees of the Agency formed a "woke" Illuminati. Additionally, the persons involved in their termination redefined Plaintiffs' support for civil rights with an opposition to it and conflated Plaintiffs' performance of work-assigned tasks with entrenched personal and political support for specific policies.

The defenestration of the Plaintiffs from their employment violated two core principles of the federal service: adherence to the merit-based employment system set for under the Civil Service Reform Act ("CSRA") and support for and protection of the civil rights of all federal workers and the entities that support them. Congress established these principles so that the Federal Government serves as a model employer and a Northstar for the American workforce: a merit-based workforce, free of discriminatory animus and retaliation.

But Constitutional rights of due process and employment rights were brushed aside in this case in a publicly affirmed blitzkrieg-like attack on USAID, one that specifically sought to end USAID's mission and denigrate its employees. Plaintiffs were the first victims in that assault.

On May 7, 2025, Plaintiffs timely appealed their terminations as "mixed-case appeals" before the Merit Systems Protection Board ("MSPB"): asserting both an unlawful termination and a violation of federal equal employment opportunity ("EEO") laws.[2]

---

[2] The Equal Employment Opportunity Commission (EEOC) imposes a 180-day jurisdictional limit before an employee can proceed to federal court in filing a formal EEO appeal. In a mixed-case appeal, the MSPB filing operates as the

The Board has not taken any substantive action on this extensive appeal since that day.[3] Because more than 120 days have passed with no decision from the MSPB, the Plaintiffs hereby exercise their right under the law to proceed in the district court. As the Complaint details, Plaintiffs' constitutional rights, as well as their right under the CSRA and the civil rights laws and regulations have been intentionally ignored and violated. Given these violations and having exhausted their administrative remedies, we ask the Court to help Plaintiffs achieve the justice and remedies they were so flagrantly denied. The claimed Reduction in Force ("RIF") should be negated *ab initio*.

## II.  PARTIES

### a.  DEFENDANTS

1. **Defendant USAID** is a federal agency established in 1961 by President John F. Kennedy, pursuant to Executive Order (E.O.) 10973, to implement components of the Foreign Assistance Act of 1961. At all times relevant to the complaint the USAID employed the Plaintiffs as federal employees and had its principal place of business in Washington, D.C. To the extent the causes of action require naming the actual federal agency, USAID is named in that capacity.

2. **Defendant Jeremy Lewin** functioned as the Department of Government Efficiency ("DOGE") lead at USAID and in the roles of USAID Deputy Administrator for Policy and Programming and of Chief Operating Officer from March to August of 2025. He is named in his official capacity at USAID but is also a real party in interest because his actions were directly

---

equivalent of the formal appeal. While not apposite to this appeal we note that more than 180 days has passed since the MSPB appeal was lodged.

[3] MSPB has acceded to the Government's delay tactics from the outset which has caused this significant delay. While Plaintiffs timely filed their appeal, the Government almost immediately requested a 90-day stay of all proceedings in this matter. *Cambrel v. USAID*, DC-3443-25-2587-I-1, Tab 5 (MSPB May 16, 2025). The Agency, comically, stated that a 90-day stay was justified due to "a severe staffing shortage," caused by USAID's decision to RIF its own attorneys, the very same illegal action that is the core of the appeal. *Id*. These delays have nonetheless severely prejudiced Plaintiffs whose appeal is pending since May of 2025.

part of the illegal and retaliatory acts taken against Plaintiffs. Musk and other DOGE officials were personally involved in efforts to terminate the Plaintiffs and other employees at USAID. It is uncertain whether such persons had the legal authority to participate in such decisions and whether they were acting in the scope of their employment as members of the Executive branch or whether they were acting out of personal or ultra vires motives. For purposes of this Complaint, Lewin is named in his capacity at USAID, however, it may be necessary to amend the Compliant if it is established Lewin acted *ultra vires*. Defendant Lewin is also automatically substituted for Peter Marroco, as the latter officer's successor. Mr. Marroco's conduct during his tenure as the Acting USAID Deputy Administrator from February 2, 2025, to March 18, 2025 is central to this case and Mr. Marroco possesses personal information essential to this case which is not obtainable from another source with regards to his illegal and retaliatory acts taken against Plaintiffs.

3.      **Defendant Russell Vought** is the Director of the Office of Management and Budget ("OMB") and the current acting Administrator of USAID, who is, on information and belief, is a responsible and a discriminatory actor in the termination of the Plaintiffs. Plaintiffs sue Director and Administrator Vought in his official capacity.

4.      **Defendant Scott Kupor** is the director of the Office of Personnel Management ("OPM") and is the highest-ranking official in that office. Plaintiffs sue Director Kupor in his official capacity.

5.      **Defendant Marco Rubio** is the Secretary of State and is the highest-ranking official within the Department of State. Defendant Rubio served as the Acting Administrator of USAID and as the highest-ranking official within USAID from February 3, 2025, until August 29, 2025. Plaintiffs sue Secretary Rubio in his official capacity.

6. Since the actual persons who decided to strip Plaintiffs' of their duties and then remove them from employment have been hidden and disguised, additional discriminatory and retaliatory actors may be identified through discovery.

**b. PLAINTIFFS**

7. **Plaintiff Bobbie Greene** is a resident of Illinois. She worked as DEIA Training and Outreach Advisor in USAID's Office of the Administrator/Chief Diversity, Equity, Inclusion, and Accessibility Officer ("A/DEIA" or "Office of the Chief Diversity Officer") before being terminated on April 7, 2025.

8. **Plaintiff Dana Alzouma** is a resident of Maryland. She worked as Minority Serving Institutions (MSI) and Partnerships Program Initiative Lead in A/DEIA before being terminated on April 7, 2025.

9. **Plaintiff Monica Cambrel** is a resident of Maryland. She worked as Acting Division Chief, Senior Inclusionary Strategist Manager and Team Lead in A/DEIA before being terminated on April 7, 2025.

10. **Defendant USAID** is an employer, and Plaintiffs were, at all times relevant to the case, employees within the meaning of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 20003, *et seq*. (Title VII).

11. Plaintiffs were, at all times, relevant to the case, federal employees that are protected from unlawful adverse actions within the meaning of Section 2105 of the Civil Service Reform Act. 5 U.S.C. § 2105.

**III. JURISDICTION**

12. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. §1343(a)(4) (Jurisdiction over civil rights claims).

13.     This Court also has jurisdiction under 5 U.S.C. § 7702(e)(1) as review of a mixed-case appeal that has been pending at MSPB for more than 120 days. *See Kloeckner v. Solis*, 568 U.S. 41 (2012); *Perry v. MSPB,* 582 U.S. 420 (2017).

14.     This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*., and under the mandamus statute, 28 U.S.C. § 1361.

15.     The permissive joinder of the Plaintiffs in this action is appropriate pursuant to Fed. R. Civ. P. Rule 20(a)(1) because the Plaintiffs have asserted rights to relief jointly, severally, or in the alternative, with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and, because questions of law or fact which will arise in this action are common to all Plaintiffs.

## IV.     VENUE

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) (substantial acts and events) and (e) (federal defendant).

## V.     FACTS

### A.     Plaintiffs were Exemplary Employees who Conscientiously Performed the Duties Assigned to Advance Equal Employment Opportunities for Protected Classes

17.     Plaintiffs were employed by USAID until April 7, 2025, when they were removed from the Agency on the grounds that they were performing DEIA related activities.

18.     USAID notified Plaintiffs of the basis of their removal by sending Plaintiffs a specific notice of reduction in force on March 27, 2025. *See* Ex. 1.

19.     The notice stated that the RIF was "necessary to restructure USAID's operations to better reflect Agency priorities and the foreign policy priorities of the United States." *Id*.

20.     The notice did not state how the RIF would advance such objectives.

21.     In reality, the individuals who formulated and instituted the RIF wanted to virtually or completely abolish the Agency itself by removing the duties of nearly all its personnel, not so the Agency could redirect or restructure "Agency priorities" but to render such priorities a nullity.

22.     The actions did not advance the foreign policy priorities of the United States because DEI and DEIA programs were targeted towards Agency employees or were directed to longstanding USAID efforts to develop "soft-power" by assisting in efforts to advance American foreign policy throughout the world.

23.     Neutering the Agency by placing on administrative leave and terminating its entire staff, renders the explanation for the RIF pretextual.

24.     USAID removed Plaintiffs without (1) an advance written notice stating the specific reasons for the proposed action; (2) providing Plaintiffs with a reasonable time to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer; (3) the right to be represented by an attorney or other representative during this proceeding; or (4) a written decision and the specific reasons for removal in light of Plaintiffs' response.

25.     Prior to their removal, Plaintiffs were placed on forced administrative leave and were precluded from performing any functions on behalf of the Agency. *See* Ex. 2.

26.     The entire Office of the Civil Rights was also placed on administrative leave as a part of the same sham RIF program.

27.     In addition, virtually the entire Agency was simply removed from the workplace on February 7, 2025, with DOGE, at Musk's direction, removing the USAID lettering from the main entrance of USAID's building.

28.     USAID staff and contractors who worked there were not allowed inside the building to retrieve their personal belongings.

29.     The placement of Plaintiffs on administrative leave for months failed to comply with the newest amendments to the Administrative Leave Act of 2016. *See* National Defense Authorization Act for Fiscal Year 2017, § 1138 (Pub. L. 114–328, 130 Stat. 2000, December 23, 2016); *see also* 5 C.F.R. 630.1404 (Calendar year limitation). Before the placement, Plaintiffs neither requested being placed on leave, nor were they notified of any valid basis for the decision.

30.     The sole grounds for the placement on leave appeared to be based on the Plaintiffs' alleged association with DEI and DEIA programs.

31.     Plaintiffs were locked out of all Agency systems and had no access to any managerial chain, as their managers had also been placed on leave.

### a. Dana Alzouma

32.     Plaintiff Dana Alzouma had served for 27 years at USAID.

33.     Plaintiff Alzouma had worked at USAID first as a program analyst/program coordinator and subsequently as a program analyst/country desk officer before her last role at the Office of the Chief Diversity Officer.

34.     Plaintiff Alzouma had never been subject to any discipline by the Agency.

35.     Plaintiff Alzouma's performance appraisal for the previous three years was Exceeds Expectation.

36.     Substantively, Plaintiff Alzouma received superlative reviews for her performance during that period.

37.     Plaintiff Alzouma's specific duties included, among others, drafting action plans and leading the implementation of action plans that reduce barriers and enhance opportunities for minorities and minority serving institutions in and with USAID.

38.     Such activities directly implicate the enhancement and propagation of the civil rights laws as they were programs to advance the employment of protected classes.

39.     This work involved ensuring USAID's compliance with executive orders that require federal agencies to work with minority serving institutions, including, as an example, those defined by the Department of Education and outlined in the related Presidential Executive Orders signed by all incoming Presidents including President Trump's administration during both terms. *See* Exec. Or. No. 14283, White House Initiative To Promote Excellence and Innovation at Historically Black Colleges and Universities, 90 FR 17543 (Apr. 23, 2025).

40.     Plaintiff Alzouma also served as USAID representative for interagency working groups that address USAID's work with minority-serving institutions, and leading USAID programs' compliance with laws, regulations, policies, procedures that apply to representation of minorities.

41.     Plaintiff Alzouma was not assigned to a specifically designated DEI or DEIA position.

42.     Plaintiff Alzouma began serving in this position in January of 2021 in the Local, Faith and Transformative Partnerships ("LFT") HUB within the Bureau for Development, Democracy, and Innovation ("DDI"), a bureau created by President Trump's administration during his first term.

43.     This position had existed since 1997 and was moved into the new DDI Bureau in January 2021 from the Office of Small and Disadvantaged Business Unit.

44. In July 2022 Plaintiff Alzouma was detailed to the newly formed Office of the Chief Diversity Officer.

45. In January 2022, the detail ended, and the position and Plaintiff Alzouma were officially moved into the Office of the Chief Diversity Officer.

46. USAID assigned Plaintiff Alzouma's duties, and Plaintiff Alzouma's essential functions were developed and approved by the Agency as were her duties with respect to DEI and DEIA.

47. At the time Plaintiff Alzouma was placed on enforced administrative leave, she had interviewed for and was seeking a further position as Strategic Partnership Liaison for USAID's New Partnerships Initiative program.

### b. Bobbie Greene

48. Plaintiff Bobbie Greene served for 2 years at USAID.

49. Plaintiff Greene had worked at USAID first as a curriculum developer and trainer for the U.S. Embassy, Liberia and later as a senior training and development specialist before her last role at the Office of the Chief Diversity Officer as DEIA Training and Outreach Advisor.

50. Plaintiff Greene had never been subject to any discipline by the Agency.

51. Plaintiff Greene's performance appraisal was Outstanding.

52. Plaintiff Greene's specific duties included overseeing the development and implementation of Agency training policies and implementing training programs that advanced the goals of the Civil Rights Act and related regulations for Agency operating units; leading monitoring and evaluation of such training program for effectiveness and providing periodic reports on whether USAID training and outreach programs were effectively supporting a respectful, inclusive, safe working environment and culture in line with the Civil Rights Laws and

regulations; and representing USAID on various Agency boards, working groups and other bodies concerned with USAID's compliance with the said requirements.

53.     Plaintiff Greene was not assigned to a specifically designated DEI or DEIA position.

54.     Plaintiff Greene had been performing these duties since January of 2022.

55.     USAID assigned Plaintiff Greene's duties, and her essential functions were developed and approved by the Agency as were her duties with respect to DEI and DEIA.

56.     At the time Plaintiff Greene was placed on forced administrative leave, she was offered an alternative position of Pregnant Workers Fairness Act Project Manager at USAID in the Office of Civil Rights and was announced by the Director of OCR on January 15, 2025, as a new and experienced staff member.

57.     The process of transferring Plaintiff Greene into that position was halted before she was put on Administrative Leave.

### c.  Monica Cambrel

58.     Plaintiff Monica Cambrel had served for 14 years at USAID.

59.     Plaintiff Cambrel had worked at USAID first as a Senior Executive Assistant and Scheduler to the Agency's Chief of Staff, an Analyst/Advisor (Strategic Communications) within the Office of Human Capital and Talent Management, an Administrative Specialist, and later as an Administrative Management Services Officer before her last role as the Acting Division Chief, Senior Inclusionary Strategist Manager and Team Lead for the Office of the Chief Diversity Officer.

60.     Plaintiff Cambrel had never been subject to any discipline by the Agency.

61.     Plaintiff Cambrel's performance appraisal for the previous three years was Outstanding (2022), Outstanding (2023), and Exceeds Requirements (2024).

62.     Substantively, Plaintiff Cambrel received superlative reviews for her performance during that period.

63.     Plaintiff Cambrel's specific duties included, among others: formally developing and training USAID staff, both domestically and internationally, in-person and remotely, on compliance with federal laws and regulations, including the civil rights laws; managing and directing the implementation progress of USAID's diversity plans; developing hiring guides for USAID's missions, bureaus, and offices to ensure compliance with policies, procedures, laws, and regulations that protect minorities; partnering with stakeholders to advance USAID's compliant priorities in accordance with federal equal employment laws and regulations; and ensuring that USAID's operations did not directly or indirectly harm legally protected federal classes.

64.     Plaintiff Cambrel was not assigned to a specifically designated DEI or DEIA position.

65.     Plaintiff Cambrel had been performing these duties since April of 2023.

66.     USAID assigned Plaintiff Cambrel's duties, and her essential functions were developed and approved by the Agency as were her duties with respect to DEI and DEIA.

67.     At the time Plaintiff was placed on enforced administrative leave, she was seeking a further position as a Senior-level Management Analyst within the Office of Civil Rights primarily managing the newly implemented Pregnancy Worker's Act and the Agency's Reasonable Accommodations portfolios amongst other duties for and on behalf of USAID and its constituents.

68.     All three Plaintiffs' duties implicated enforcement of federal Civil Rights and Equal Employment Opportunity laws.

69.     The Administration and the Agency recast working in a DEI or DEIA function as support for discrimination to remove Plaintiffs.

70.     This somewhat Orwellian construct equated employment in programs or implementing policies designed to advance the interests of marginalized groups with discrimination itself.

71.     An employee who therefore worked in DEI or DEIA is, under the Administration's view, not limiting discrimination in the workforce but engaging it.[4]

72.     On information and belief, the persons responsible for terminating Plaintiffs perceived that they participated in the enforcement of federal Civil Rights and Equal Employment Opportunity law or conversely that Plaintiffs employment duties were violating those laws.

73.     Plaintiffs were fired in retaliation for their protected activity or under the incorrect assumption that working in DEI or DEIA was advancing discrimination itself.

74.     As such this was not a reduction in force but a conduct-based termination.

75.     Both the forced placement on administrative leave and the termination constitute major adverse actions because they acted as conduct-based punishment.

---

[4]  *See* EEOC, *What You Should Know About DEI-Related Discrimination at Work: EEOC Guidance*, (undated), https://www.eeoc.gov/wysk/what-you-should-know-about-dei-related-discrimination-work (last accessed Dec. 1, 2025), which now states:

> "Diversity, Equity and Inclusion (DEI) is a broad term that is not defined in Title VII of the Civil Rights Act of 1964 (Title VII). Title VII prohibits employment discrimination based on protected characteristics such as race and sex. Under Title VII, *DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated—in whole or in part—by an employee's or applicant's race, sex, or another protected characteristic.*"

(emphasis supplied)

76.     A "sham RIF" is also actionable as an adverse action.

77.     The substance and nature of an adverse action, not its designation, controls.

78.     Plaintiffs are entitled to a "mixed case" claim, as the adverse action against them involved both a violation of federal personnel law and a violation of equal employment opportunity law.

79.     Plaintiffs elected to proceed on this mixed case appeal to the Merit Systems Protection Board.

80.     Under controlling law, Plaintiffs are entitled to bring a "mixed case" to the United States District Court once that claim is temporally exhausted.

81.     Plaintiffs have met that temporal requirement.

**B.      The Defendants' own Admissions Establish the Illegal Motives for Terminating Plaintiffs**

82.     On January 20, 2025, President Donald Trump, on his first day in office, signed an Executive Order titled "Ending Radical and Wasteful Government DEI Program and Preferencing." Exec. Or. No. 14151, 2025 WL 315841 (Jan. 20, 2025).

83.     The Executive Order claimed that "diversity, equity, and inclusion" programs and activities that civil servants had previously conducted under "[t]he Biden Administration" were "illegal and immoral discrimination programs."

84.     This Executive Order found that DEIA programs, such as "Equity Action Plans," at federal agencies demonstrate "immense public waste and shameful discrimination."

85.     This Executive order did not provide any definition of what DEI or DEIA programs and activities were.

86.     To this day neither the President, the Agency, or the Executive Agencies such as the Equal Employment Opportunity Commission have defined what DEI or DEIA is.

87.     The Administration has not stated what constitutes diversity, equity, or inclusion, how such programs are actually wasteful, or how they are illegal, immoral, shameful, cause public waste, or foster discrimination.

**C.      USAID is an Agency Created by Congress and was Tasked with Advancing the Interests of Minorities in Employment**

88.     Since its establishment in 1961, USAID employees have conducted the statutory mandates imposed on the Agency and other program-specific mandates imposed by Congress under the stewardship of eleven different presidential administrations.

89.     USAID programs throughout the years have supported the United States' political and strategic interests across the world, including by providing assistance to countries in conflict, whether that conflict is spurred on by poverty, disease, economic or political crises, or other humanitarian needs.

90.     To achieve this goal, and like all other federal agencies, Congress has, for more than half a century, required USAID and the Department of State to develop and implement affirmative action programs that ensure equal employment opportunity and compliance with the Civil Rights Act of 1964.

91.     The Department of State and USAID had complied with these requirements for more than half a century under both Republican and Democratic administrations before the drastic unlawful shift that animated this lawsuit.

92.     In December of 1987, President Reagan signed the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, which directed the Government Accountability Office to review the personnel practices within the Department of State to determine "whether minorities and white women" were underrepresented or receiving disparate treatment in employment decisions. *See*

16

GAO, Report to Congress, Minorities and Women Are Underrepresented in the Foreign Service, https://www.gao.gov/assets/nsiad-89-146.pdf.

93.    In 1992, USAID Administrator under Geroge H.W. Bush testified to Congress about establishing a workforce planning group "to expand our intake of women and minorities," and the establishment of "the minority recruitment advisory group," which the Administrator identified as "a strong advocate for affirmative action throughout the Agency." *See* Foreign Operations, Export Financing, and Related Agencies Appropriations for Fiscal Year 1992, Statement of Ronald W. Roskens, Administrator for USAID before the Subcommittee of the Committee on Appropriations (May 7, 1991) (printed in S. Hrg. 102-295 pt. 1).

94.    In 2003, the Assistant Administrator for Management and Chief Information Officer for USAID testified before Congress about President Geroge W. Bush's plan to ensure "there is adequate representation of minority and female candidates for assignment to executive positions" at USAID. *See* Strategic Workforce Planning at USAID, Statement of John Marshall, Assistant Administrator for Management and Chief Information Officer for USAID before the House Committee on Government Reform (Sept. 23, 2003).

95.    Despite decades of such non-partisan effort to ensure USAID is compliant with the legal requirements to maintain a diverse workforce, Congress still viewed the job as unfinished, noting in 2020 that USAID needed to take additional steps to meet Equal Employment Opportunity requirements. *See* USAID: Mixed Progress in Increasing Diversity, and Actions Needed to Consistently Meet EEO Requirements, GAO Rep. No. 20-477 (June 23, 2020) https://www.gao.gov/products/gao-20-477.

96. Plaintiffs' roles and responsibilities at USAID were a continuation of this legacy: ensuring that USAID is legally complaint with the civil rights and EEO rights and obligations that Congress had emphasized for half a century, detached from partisan politics.

**D. Failure to Define DEI and DEIA Makes Employment Actions based upon it Arbitrary and Capricious.**

97. Despite this history and the Agency's background continuing legal obligations, the Executive Branch has used the terms DEI and DEIA loosely and vaguely to describe a perceived political ideology that fosters the hiring, inclusion, and equitable treatment of marginalized groups.

98. The marginalized groups covered by DEI and DEIA programs and policies include women, minorities, persons over forty, persons with a non-heterosexual sexual orientation, and persons with physical and mental disabilities.

99. This is because DEI policies, to the extent they were actually instituted, were an expression and implementation of the obligation of the Federal Government to serve as a model employer under the civil rights laws that protect groups such as women, minorities, persons with a non-heterosexual orientation, and persons with physical and mental disabilities.

100. Under the Nation's Civil Rights law, such groups are considered protected classes.

101. Without defining what they were, Executive Order 14151 called for "termination of all" DEIA "mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."

102. This Executive Order charged the Director of OPM to review and revise "all existing Federal employment practices," and programs to "comply with this order."

103. This Executive Order required every federal agency, "in consultation with the Attorney General, the Director of OMB, and Director of OPM," to take steps to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions

(including but not limited to 'Chief Diversity Officer' positions); all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."

104.    On January 21, 2025, President Trump signed an executive order titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." Exec. Or. No. 14173, 2025 WL 343886 (Jan. 21, 2025).

105.    This Executive Order labeled federal government DEI work under the previous administration as "dangerous, demeaning and immoral..."

106.    This Executive Order labeled federal government DEIA work under the previous administration as "illegal…unlawful, corrosive, and pernicious."

107.    This Executive Order required all federal agencies to "terminate all discriminatory and illegal preferences, mandates, policies, and programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements."

108.    The President and the Executive Branch have made no effort to narrowly define what DEI or DEIA programs and policies actually are, nor have they identified how employees assigned some form of employer-imposed duty to carry out the objectives of such policies and programs were involved in immorality or misconduct.

*109.*    This executive order connected DEI with the Civil Rights laws of the United States, going so far as revoke other executive orders that were implemented along with the passage of the Civil Rights Act of 1964, *and a slew of other executive orders expressly designed to combat discrimination against classes protected under the Civil Rights Acts.*

110.    The January 22, 2025, fact sheet released by the White House also made the connection between DEI and Civil Rights crystal clear, as it was titled "President Donald J. Trump

Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI." White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025).

111.    Again, these Executive Orders never defined what the terms "DEI," "DEIA," "diversity," "equity," "equity-related," "inclusion," or "accessibility" meant.

112.    Accessibility in the employment context is in fact a legal principle expressly protected under disability law. *See* Americans with Disabilities Act, Title II, and Rehabilitation Act of 1973, § 502; *see also Nat'l Ass'n of Diversity Offs. in Higher Educ. v. Trump*, 2025 WL 573764 at *19 (D. Md. Feb. 21, 2025) (finding that the administration's vague references to DEI seem to be intended to "extend [] beyond areas addressed by anti-discrimination efforts and civil rights laws.").

113.    Every federal employee and federal contractor is required to provide equal employment opportunity to members of protected classes and to provide accessibility to persons with disabilities to federal programs and federal employment.

114.    The executive orders did not expressly call for the termination of employees who performed DEI and DEIA related functions.

115.    Nevertheless, persons associated with DOGE, with USAID and OMB. Combined and conspired to interpret the Executive Orders as a basis for the termination of, not the alleged offending programs, but of the employees conducting the programs.

116.    On January 21, 2025, Charles Ezell, then-Acting Director of the Office of Personnel Management issued a Memorandum entitled: "Initial Guidance Regarding DEIA Executive Orders."

117.    This memorandum directed all federal agencies to place "all employees of DEIA Offices" on administrative leave, close DEIA offices, and ask employees "if they know of any efforts to disguise these programs by using coded or imprecise language."

118.    The lack of any concrete definition of DEI or DEIA and the failure of the President to direct any specific actions to remove employees for being involved in DEI or DEIA programs renders the removal of Plaintiffs from their employment illegal under any circumstances.

119.    The refusal to be transparent as to why Plaintiffs were being removed from their duties, may have been designed to avoid triggering the obligations under the CSRA for procedures that relate to conduct or performance based adverse actions (and its equivalent for members of the foreign service through the Foreign Service Act).

120.    Such actions grant the affected employee, written notice of the specific allegation against them, an opportunity to respond to those allegations both in writing and orally, the right to be represented by counsel, a written decision letter that details the application of mitigating or exculpatory evidence on the charged offenses, and the right to appellate review.

121.    *Plaintiffs received none of these protections, although they were removed not for any reorganizational purpose or lack of work, but because of the specifics of their employment role itself.*

122.    Whether OPM had such authority to direct agencies to remove employees from active employment rolls is questionable, but Ezell asserted the actual and apparent authority to do so.

123.    As with the Executive Orders, the OPM memorandum did not provide a legal definition of the terms DEI or DEIA and did not cite to any legal authority that authorized OPM

to place employees in federal agencies, other than OPM, on administrative leave, or to terminate such employees.

124.    The lack of a definition of the conduct itself, which lead to the removal of Plaintiffs constitutes a lack of notice of the wrongfulness of the conduct or the rationale for the removal.

125.    Without defining conduct, the employees could not be on notice of the claimed discriminatory nature of the underlying work.

126.    This lack of notice meant that they could not seek to repudiate the role they were in or seek other employment in the Agency or the Federal Government.

127.    As such the entire premise for the adverse action whether a removal or a claimed RIF was patently illegal since it was based on an arbitrary and capricious definition of the basis for the action itself.

128.    The anti-civil rights motivations of the Administration and the officials conducting the terminations appear to be directed at the civil rights functions of the Agency. *Trump Officials start dismantling civil rights offices, as part of DOGE's secret plan*, Wash. Post, (Feb. 28, 2025), https://www.washingtonpost.com/nation/2025/02/28/doge-trump-civil-rights-office-closing-eeoc.

**E.      Placement on Enforced Administrative Leave was both Adverse Employment Action and Retaliation for Civil Rights Activity**

129.    On January 22, 2025, Plaintiffs were stripped of all employment duties, denied access to their office space and computer systems, and placed on enforced administrative leave, solely because of their alleged role in DEI and DEIA programs.

130.    Plaintiffs did not request such leave and were not under any investigation for, or had charges pending from, any conduct or performance-based allegation.

131.    Plaintiffs received no due process in any adverse employment action, be it in relation to being placed on administrative leave or being terminated.

132.    The Defendants sought to preclude the Plaintiffs from having any ability to even appeal these actions. The Agency terminated its entire Civil Rights Office and EEO staff, denied employees access to systems by which they could lodge a complaint or appeal, and failed to apprise the Plaintiffs of their rights to administratively contest their placement on extended enforced leave, to protest the removal of their duties, or to challenge the so-called RIF in any way.

133.    The removal of the Civil Rights Office staff rendered Plaintiffs unable to seek guidance or bring the Federal Sector EEO complaint process itself.

134.    As such the *de facto* abolition of the Office of Civil Rights amounted to a discriminatory and retaliatory act because it obstructed the ability of the Plaintiffs to assert and protect their rights.

135.    Whatever the legitimacy of the claimed RIF (and Plaintiffs assert there were none), the Defendants failed to apprise the employees of their rights to contest the actions against them and denied them access to information and personnel who manage such grievance procedures.

136.    Removal of all duties amounted to both an adverse employment action and a constructive suspension.

137.    The enforced placement on administrative leave altered the terms and conditions of employment and was designed to both punish Plaintiffs for their performance of duties connected with civil rights and to equate their conduct in supporting such activities as a form of discrimination and to create hostile work environment.

138.    At the same time the Plaintiffs were placed on administrative leave, the Agency attempted to secure the employees' resignation by advising them that they could resign from the

Agency while securing additional extended salary during an imposed period of administrative leave.

139.    This so called "Fork in the Road" offer was itself part of the sham and hostile work environment. The offer was patently illegal as it required employees to surrender all appeal rights in return for some unspecified period of pay, during which the employee could be on paid leave or returned to work at the Agency's whim.

140.    The "Fork in the Road" was an act of retaliation and reprisal and part of a hostile work environment.

141.    It was designed to shatter morale and secure the surrendering of employment rights while offering no legally enforceable benefit.

142.    Adding to the hostile environment and interference, the Agency moved to abolish its own legal office.

143.    When the Plaintiffs attempted to assert their mixed case rights and file appeals, the Agency largely ignored the appeals.

144.    The actions taken by Defendants, individually or in combination were specifically and intentionally deigned to violate the rights of Plaintiffs and to delay and frustrate the ability of the Plaintiffs to assert their rights.

145.    The actions taken by Defendants involved discrimination based on their actual or perceived support for policies and programs designed to foster implementation of the civil rights laws of the United States.

146.    The actions taken individually and separately sought to and did interfere with the Plaintiffs' right to determine the basis for the actions against them and to participate in any administrative appeals.

147.     DEI and DEIA programs assigned to Plaintiffs, involved enforcement of the civil rights laws and advancement of policy objectives designed to foster the hiring, retention and advancement of persons who were members of protected classes based on sex, race, national origin, gender identity, disability, or age-related status.

148.     Defendants took actions that impacted on the terms, privileges and conditions of Plaintiff's employment based on their actual or perceived support for the civil rights acts including Title VII, the Age Discrimination in Employment Act, the Rehabilitation Act of 1973 and other laws that promote equal employment opportunity.

149.     On information and belief, all employees in the Office of Diversity were themselves members of protected classes.

150.     Plaintiffs are all female.

151.     Whether by direct discriminatory intent or by disparate impact, the actions taken against Plaintiffs encompassed acts of discrimination, retaliation, and reprisal against them.

152.     Defendants, alone and in combination, intended to and did inflict emotional distress and pain and suffering on Plaintiffs, because of their connection to and performance of federal EEO related activities.

153.     Defendants, alone and in combination, intended to and did create a hostile work environment. Their acts were specifically designed to and did force the termination of Plaintiffs employment.

154.     The acts of Defendants, alone and in combination, were specifically designed to and did "terrorize," humiliate, degrade, and demean Plaintiffs. Aspersions were cast as to their competence and integrity, and they were associated with radical ideologies based on little more than the fevered visions of the Administration, DOGE and Agency officials who created a legal

boogeyman out the term DEI and DEIA to hide the real target of their assault: Equal Employment Opportunity.

155.    Unlike MSPB based actions the EEO laws provide for compensatory and non-compensatory damages.

156.    The acts taken by the Agency were in reckless disregard for Plaintiffs' rights and were grossly negligent if not intentional on their infliction of emotional distress.

157.    The acts caused actual and emotional harm and damages.

158.    Defendants, alone and in combination, are liable for the harm done to Plaintiffs, including wrongfully terminating their employment, inflicting emotional distress and pain and suffering, creating a hostile work environment, and depriving them of the terms and conditions of their employment, as part of a discriminatory scheme.

159.    These actions form the basis for a mixed case appeal, in that the wrongful termination is also combined with discriminatory animus.

160.    Plaintiffs have properly exhausted their mixed case appeal rights and thus may bring this action to the United States District Court seeking restoration of assignment and duties, restoration of all benefits, back pay, front pay, injunctive relief and attorney's fees and costs as well as pain and suffering for each of them to the maximum extent authorized by law.

161.    Plaintiffs' causes of action are virtually identical, and they are properly grouped as Plaintiffs in a single suit.

162.    Plaintiffs had no conduct or performance issues and were similarly situated in terms of employment.

163.    The MSPB is currently inundated with appeals and aside from the fact, the administrative appeal is now exhausted, it is unlikely that the MSPB will adjudicate the appeal in

a fashion that would actually provide for a meaningful or timely remedy. See Nat'l Ass'n of Immigr. Judges v. Owen, 139 F.4th 293, 306 (4th Cir. 2025) (finding that MSPB's current situation raises a factual questions "as to whether the CSRA's adjudicatory scheme continues to function as intended," and that district courts must resolve "on a factual record," whether proceeding before the MSPB remains viable at all).

164.    The U.S. District Court is the only proper legal and practical forum for the Plaintiffs to seek a remedy.

**F.    Admissions that Establish that the Terminations were not part of a valid RIF.**

165.    On February 2, 2025, President Trump emphatically stated that he would be removing USAID employees based on the claimed ideology of the individual employees themselves.

166.    President Trump stated: "It's been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision." *President Trump Speaks to Reporters Upon Return from Mar-a-Lago*, C-SPAN (Feb. 2, 2025), https://www.c-span.org/program/public-affairs-event/president-trump-speaks-to-reporters-upon-return-from-mar-a-lago/655273.

167.    Elon Musk, then serving as the head of the DOGE, stated that shutting down USAID was justified because the workers were "incredibly politically partisan" and their work has supported "radically left causes throughout the world including things that are anti-American." Jennifer Hansler et al., *Elon Musk said Donald Trump agreed USAID needs to be 'shut down,'* CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge.

168.    Elon Musk participated in USAID's decision-making to reorganize and terminate certain employees.

169. Elon Musk also stated that "USAID is a criminal organization" and that it was "[t]ime for it to die." Elon Musk (@elonmusk), X (Feb. 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414194835755?lang=en.

170. On February 3, 2025, Musk stated that he has been working to feed USAID "into the woodchipper." Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM), https://x.com/elonmusk/status/1886307316804263979?s=46.

171. On February 5, 2025, White House deputy chief of staff for policy, Stephen Miller, stated that upcoming USAID cuts were meant to address the political make-up of the Agency.

172. Stephen Miller stated: "I want to really drill down on this…because it is so important, there's two million employees in the federal government. Overwhelmingly, the career federal service in this country is far left, left-wing." *Jake Tapper left stunned as Stephen Miller explains why Trump ordered a surprise freeze on federal spending*, Daily Mail (Jan. 29, 2025), https://www.dailymail.co.uk/media/article-14336461/Jake-Tapper-Stephen-Miller-trump-freeze-fed-spending.html.

173. Stephen Miller continued the attack on USAID DEI personnel, labeling them as "radical left Marxist" who support gender studies and "diversity, equity, inclusion all over the world."

*174.* Focusing specifically on USAID employees, Stephen Miller added: "We looked at USAID as an example, 98 percent either donated to Kamala Harris or another left-wing candidate." *USAID has been 'exposed' as the funding mechanism for the radical left, says Stephen Miller*, Fox News (Feb. 5, 2025), https://www.foxnews.com/video/6368342845112.

175.     Peter Marocco, who was selected to serve as the Deputy Administrator of USAID, also justified the reorganization of workforce and elimination of Plaintiffs' positions in political terms.

176.     In 2023, Peter Marocco described USAID employees' responsibilities as working on "Democrat" or "liberal word soup" programs. *Pete Marocco tried to upend USAID in 2020 — and failed. In 2025, he dismantled it*, NPR (Mar. 25, 2025), https://www.npr.org/sections/goats-and-soda/2025/03/25/g-s1-50582/usaid-pete-marocco-trump-foreign-aid.

177.     Mr. Marocco has overseen and ordered termination of employees at USAID based on perceived political affiliation of individual employees and based on the decision that USAID employees' work on enforcing DEIA laws and policies constitute federal crime.

178.      Mr. Marocco's position violates the civil rights and EEO rights and obligations of USAID employees who were responsible for DEIA work, including Plaintiffs.

179.     During his previous stint at USAID, Mr. Marocco served as the Bureau of Conflict Prevention and Stabilization Assistant to the Administrator.

180.     In 2020, a 13-page complaint by USAID staffers informed USAID leadership at the time that Mr. Marocco's "interventions," in the contracting process was raising "potential legal liabilities." *See Dissent Channel Memo on OTI's Degrading Capacity, Reduced Strategic Impact, and Wasted Resources* (Sept. 17, 2020).

181.     The USAID staffers' letter detailed that Mr. Marocco had specifically questioned "renewing the contracts of individual [personal service contractors] working on programs whose goals he does not support, even though the individuals have highly favorable performance reviews and the programs are widely supported within the interagency."

182.     The USAID staffers' complaint letter stated that in at least three cases, Mr. Marocco had asked to speak individually with USAID personal services contractors before approving the renewal of their contract.

183.     Upon information and belief, Marocco used his position in 2025 to berate and threaten USAID staff, accusing employees of disloyalty and misuse of government funds and stating that he was determined to see them fired.

184.     In a meeting with congressional members, Mr. Marocco indicated that he was considering criminal referral to the Department of Justice for employees involved with the USAID programs that were being cut, which included Plaintiffs' work. *Trump administration considering criminal referrals in USAID fight*, The Hill (Mar. 5, 2025),

https://thehill.com/policy/international/5178414-trump-administration-usaid-criminal-referrals/.

185.     Mr. Marocco oversaw and helped direct Plaintiffs' termination and forced placement on administrative leave and did so because he believed that Plaintiffs were among the employees who were supporting the Democratic party and that their work on DEIA amounted to criminal activity, and, therefore, Plaintiffs should be punished for their past conduct.

186.     President Trump also appointed Tim Meisburger as a bureau head in USAID in January of 2025.

187.     In August of 2023, Meisburger published an article titled "Political Discrimination Threatens U.S. Foreign Assistance." Tim Meisburger, Political Discrimination Threatens U.S. Foreign Assistance, Heritage Found. (Aug 15, 2023), https://www.heritage.org/global-politics/report/political-discrimination-threatens-us-foreign-assistance.

188. Meisburger's work and the associated article included researching the political affiliation of USAID employees and traced the problem to the perceived political ideology of USAID's employees.

189. The article claimed that "well over 90 percent (and sometimes 100 percent) of [USAID] employee contributions went only to Democratic candidates and causes," and advocated for eliminating "USAID's political bias."

190. The combined weight of these public statements confirms that USAID employees were removed for their perceived political and ideological bias.

191. When it came to employees who were perceived to work in DEI and DEIA functions and programs, the ideological hostility and opposition to their civil rights functions combined to form the basis for the removal of Plaintiffs and the subsequent mass termination of the majority of Agency personnel.

192. In line with these public statements and accusations, USAID closed the DEIA Office on January 22, 2025.

193. Then-Acting Administrator for USAID, Jason Gray, stated that the DEIA Office was being closed "in accordance" with the two DEIA executive orders. *See* Ex. 3.

194. Mr. Gray's announcement informed USAID employees that USAID was conducting OPM instructions in enforcing the DEIA executive orders.

195. Mr. Gray's guidance to the USAID staff regarding the closure of DEIA Office and termination of Plaintiffs' positions, like the contemporaneous public statements outlined, confirmed that the termination was for disciplinary purposes and not reorganization.

196. The Guidance required USAID employees to report DEIA activities or exercise of "similar ideologies," by their coworkers to an OPM email address: DEIAtruth@opm.gov.

197. The Guidance stated that "failure to report this information within ten calendar days from today's date may result in disciplinary action," indicating that DEIA employees were being terminated for disciplinary reasons, i.e., for cause.

198. Contemporaneous with these public statements explaining that USAID needed to be downsized to control what these officials viewed as left-leaning ideology, and labeling Plaintiffs' work as immoral and criminal, USAID terminated Plaintiffs on April 7, 2025, after two months of having them on forced administrative leave.

199. More recent statements from the Executive branch confirm the political and ideological bias behind all of the terminations being conducted against the federal workforce.

200. These actual statements taken individually or in combination support the claims that the USAID's termination of Plaintiffs were:

    a. Based on the perceived ideological function of their job.

    b. Based on the perceived ideology of the employees themselves.

    c. Based on the belief that DEI and DEIA involved a form of discrimination itself.

    d. Pretextual and had nothing to do with any analysis consistent with a valid reduction in force.

    e. Conduct-driven, conflating the employees' assignments with the employees' ideology, and then removing the employee for that perceived ideology and for performing duties that the Agency had assigned them.

**G.** **The Terminations rise to the Level of a Constitutional Claim**

201. The termination of rank-and-file federal employees merely for their perceived political or ideological association is not only a violation of the Merit Systems principles and the CSRA, but also a violation of their rights under the First Amendment to the Constitution.

202.    The termination of rank-and-file federal employees merely for their perceived political or ideological association is repugnant to the fundamental oath the employees take to preserve and protect the Constitution of the United States against all enemies foreign and domestic. 5 U.S.C § 3331.

203.    Federal employees do not work for the President or the personal or political objective of any particular supervisor. They work for the American public and their obligations run not to persons but principles.

204.    To tie federal employment to loyalty to a specific political ideology or official would reduce federal employment to a form of political peonage.

205.    Such systems are more in line with an authoritarian regime, than a democratic government.

206.    The actions taken against Plaintiffs are so devoid of merit and procedural protections, as to rise to a violation of due process itself in violation of their Fifth and Fourteenth Amendment rights. The President, DOGE, and the Agency presumed that Plaintiffs were hostile to the Administration and engaged in a form of illegal and criminal advocacy of "woke" and "radical" agendas.

207.    Conflating the employee's political or ideological agenda with the tasks assigned to them ignores that federal employees are obligated to perform such duties.

208.    Punishing the employee for performing the tasks they were duly assigned is as arbitrary and capricious as it is antithetic and contrary to long-established federal and American labor law. Unless an employee is asked to perform a clearly illegal or unethical task, they are required to conduct the objectives they are assigned by their employer.

209.     If employers had the unfettered right to simply remove employees who they suspected disagreed with them on political or ideological grounds, especially when performing duties in the public sector, the right to free association and expression would be rendered meaningless. Employees could be cowered or forced to adopt the political or ideological outlook of their employer simply to ensure that they remain employed.

210.     A corrupt workforce is antithetical to a free and effective workforce and will harm the public, as well as violate the basic tenets of federal employment law as embodied by the merit system principles.

211.     A technically proficient workforce, particularly when performing public functions and paid by public coffers is essential to the proper use of and accounting for public funds and protection of the public interest.

212.     A public sector that was reduced to political cronyism would also render enforcement of EEO laws impossible. An employer could escape liability for characterizing association with a protected class as politically objectionable. Thus, a public employer would argue that they are not disciplining or firing someone based on race, sex, national origin, sexual orientation, or disability status (or military status for that matter) but because of their perceived ideology.

213.     As further proof of this corrosive deployment of patronage, the OPM has developed questions for federal employment that relate to and judge offers of employment and continuation of employment on the support of the applicant or employee for the policies of the President.

214.     Russell Vought, the current titular head of USAID has personally advocated for these policies, and OMB has created criteria and grading for Senior Executive Service personnel and rank and file employees to be queried and graded on their political or ideological beliefs.

**H.    The Terminations were not part of a valid RIF, that action is a "Sham."**

215.    A reduction in force is an "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions…" *Welch v. Department of the Army*, 323 F.3d 1042, 1046 (Fed. Cir. 2003).

216.    A reduction in force "is not an adverse action against a particular employee, but is directed solely at a position within an agency." *Welch*, 323 F.3d at 1046 (citing *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002).

217.    A reduction in force  may not be used as a disguised adverse action to remove employees.

218.    The Federal Government has used RIFs sparingly, and, as they are neutral actions directed towards positions and not individuals, there are established procedures to ensure the RIF is conducted for a legitimate reorganizational purpose.

219.    Federal employees subjected are generally reassigned to other positions or agencies when their positions are abolished or the function of their positions are transferred.

220.    At no time, since the passage of the CSRA, has the government engaged in the wholesale and chaotic dismissal of so many federal employees as that which occurred with USAID.

221.    Pursuant to 5 C.F.R. Part 351, a reduction in force is authorized when there is a: (1) Lack of work; (2) Shortage of funds; (3) Insufficient personnel ceiling; (4) Reorganization; (5) An individual's exercise of reemployment rights or restoration rights; or (6) Reclassification of an employee's position due to erosion of duties when such action will take effect after the Agency has formally announced a RIF in the employee's competitive area and when the RIF will take

effect within 180 days. *See* also USAID's Automated Directives System ("ADS"), Chapter 452 (Reduction in Force- Civil Service) § 452.3.1(b).[5]

222. There is no historical precedent for an RIF that simply abolishes an agency in the manner conducted against USAID.

223. RIF regulations "are numerous, spanning an entire Part of the Code of Federal Regulations. Therefore, properly preparing for and implementing a RIF can often take well over a year." *State of Md. v. U.S. Dep't of Agriculture*, 151 F.4th 197, 205 (4th Cir. 2025) (internal citation omitted) (citing 5 C.F.R. §§ 351.201-351.902).

224. The Agency ignored the calculated inquiry that should have been deployed in determining whether and how to reduce Plaintiffs and other USAID employees in force.

225. The Agency never identified a lack of work.

226. The Agency never identified a shortage of funds.

227. The Agency never identified an insufficient personnel ceiling.

228. The Agency never identified a reorganization as defined under the regulations. 5 C.F.R. § 351.203

229. The Agency took its action without notifying Congress of the RIF or seeking Congressional participation.

230. The Agency did not consult with any public employee union in advance of the RIF.

---

[5] The Defendants also failed to follow any appropriate agency-based procedures regarding the alleged RIF. these procedural defects included (1) failure to "explore with the employee's exclusive representative all available alternative measures to avoid a RIF or to minimize its affects," *see* ADS 452.3.1; (2) ensuring that the RIF is not being "used to avoid any prescribed procedures for other situations, e.g., adverse actions," *see .id.*; (3) failure to adequately establish a retention register where "*the Agency* defines the competitive area," *see* ADS 452.3.3 and 452.3.3.3, and (4) failure to ensure that the competitive areas are "in effect at least 90 days prior to the effective date" of the RIF, *see* ADS 452.3.3.1.

231. The Agency did not uniformly or consistently apply the RIF regulations set forth at 5 C.F.R. § 351.201(c).

232. The Agency did not identify any surplus of work. 5 C.F.R. § 351.201(a).

233. The Agency did not identify the tenure of impacted employees under the RIF.

234. The Agency did not identify any "transfer of function." 5 C.F.R. §§ 351.203, 301.

235. The Agency did not limit any undue interruption of employee activity. 5 C.F.R. § 351.203.

236. The Agency did not properly identify a "competitive area." 5 C.F.R. § 351.402.

237. The Agency did not properly identify a "competitive level." 5 C.F.R. § 351.403.

238. The Agency did not properly create a "retention standing classification." 5 C.F.R. § 351.501.

239. The Agency did not properly create an "order of retention." 5 C.F.R. § 351.502

240. The Agency did not offer employees another assignment at the time of the RIF. 5 C.F.R. § 351.602

241. The Agency did not provide or consider "assignment rights." 5 C.F.R. § 351.701.

242. The Agency did not follow the "rights and prohibitions" applicable to RIFs. 5 C.F.R. § 351.704.

243. The Agency failed to provide appropriate notices of the RIF. 5 C.F.R. §§ 351.801 and 802.

244. The Agency ignored the requirement that it reissue notices when it changed the RIF. 5 C.F.R. §§ 351.804, 805.

245. The Agency failed to maintain employees on active-duty status during any notice period. 5 C.F.R. §§ 351.805, 806.

246. The Agency failed to provide a Certification of Expected Separation. 5 C.F.R. § 351.807.

247. This systematic failure to follow the RIF regulations prior to separating employees is additional evidence of both the pretextual and the arbitrary and capricious nature of the Agency's actions.

248. The Agency either ignored or recast the entire procedural landscape for reductions in force, and each failure to abide by these voluntarily adopted regulations constitutes a separate violation of Plaintiffs' due process rights.

**I. Events That Establish That There Was No Legitimate Reduction in Force**

249. On March 28, 2025, the Department of State announced that USAID's foreign assistance programs will be curtailed and moved to the Department of State. Dept. of State, On Delivering an America First Foreign Assistance Program (Mar. 28, 2025), *available at* https://www.state.gov/on-delivering-an-america-first-foreign-assistance-program/.

250. On that day, USAID employees received a notice from Jeremy Lewin titled "USAID's Transition to the State Department."

251. That notice stated that the Department of State "will seek to retire USAID's independent operation," and that the Department will assume responsibility for whatever USAID program that is not terminated in full. *Id.*

252. Rather than classify USAID employees into competitive groups as the federal regulations regarding RIF require, the Agency contended that each employee was in their own category, thus rejecting an essential component of a validly constituted RIF.

253.    The notice of upcoming reduction in force did not reassign USAID employees and instead stated that the Department of State will conduct its own "independent hiring process," which will only "be available for eligible USAID employees." *Id*.

254.    Upon information and belief, a selective group of more than 300 USAID employees have been offered positions within the Department of State.

255.    On information and belief, these employees were retained due to their actual or perceived political and ideological affiliation.

256.    Neither the Department of State nor USAID has disclosed the transfer and hiring process for these transitioning employees to establish compliance with the competitive hiring process.

257.    Even though USAID terminated Plaintiffs under the guise that their work was no longer needed, the Department is still under the obligation to maintain a staff that would enforce the Civil Rights Act and related EEOC regulations in a non-political manner.

258.    Those staff were also terminated, depriving employees of the right to grieve any equal employment matters.

259.    Even though Plaintiffs have experience and qualifications in enforcing the Civil Rights Act and related EEOC regulations in a non-political manner, they were terminated as a punishment for their perceived political beliefs as opposed to being reassigned to continue working pursuant to the Administrations' orders and priorities.

260.    Defendants continue to engage in this illegal act by seeking to rehire for Plaintiffs' positions but narrowing the candidates to those who share the President's political affiliation.

261.    The Department of State has advertised positions for functions previously performed at USAID.

262.     The Department of State has contended that former USAID employees hired in these new State Department positions will lose rights, benefits, and privileges they had while serving in the civil or foreign service at USAID.

263.     Such acts establish that the RIF was a sham and that the entire termination and rehiring process is an expression of discriminatory and retaliatory intent.

264.     On information and belief, State Department hiring of former USAID personnel involves screening them for participation in suspected DEI and DEIA activities and assignments.

265.     On information and belief, State Department hiring of former USAID personnel involves screening them for actual or suspected political and ideological beliefs.

266.     This rehiring process, which is itself discriminatory and retaliatory, is evidence that the claimed rationale for the RIFs at USAID, including those of Plaintiffs, was pretextual and a sham.

267.     On May 29, 2025, OPM issued a memorandum on "Merit Hiring Plan" to all departments and agencies. OPM, Merit Hiring Plan (May 29, 2025), *available at* https://www.opm.gov/policy-data-oversight/latest-memos/merit-hiring-plan/.

268.     The Merit Hiring Plan memorandum requires agencies to consider applicants' answers to four essay questions in making hiring decisions.

269.     These essay questions assess the applicants' political allegiance to the President's political party by compelling responses that emphasize the applicants' personal affection for the current administration's policies, as opposed to the applicable agency's statutory mandated mission statement.

270.    The memorandum does not specify any standards for determining positions where effective performance may rely on political loyalty or affiliation and instead requires that questions apply to any applicant for a federal job announcement "graded at GS-05 or above."

271.    The questions serve as a blanket political loyalty test regardless of the position.

272.    Public statements by deciding officials that describe USAID cuts in terms of political affiliation have also continued even after the termination of Plaintiffs' employment.

273.    In justifying USAID cuts, on June 25, 2025, Russell Vought, the OMB director, , stated: "Most Americans would be shocked and appalled to learn that their tax dollars, money they thought were going to medical care, was actually going too far-left activism, population control and sex workers." *OMB Director on Recissions*, C-SPAN (Jun.25, 2025), https://www.c-span.org/clip/senate-committee/omb-director-on-recissions/5166473.

274.    Under 5 C.F.R. Part 734, employees who are not appointed through advice and consent of the Senate are generally free to participate in civil life and political matters so long as they do not use their government function to endorse, induce, or reward a particular political cause or party with a benefit or use the same position to the detriment of any political cause or party. The regulations are designed to balance the right of employees to participate in political elections and advocacy and to protect against the possible misuse of federal employment to support a particular candidate or to confer a government benefit based on such partisan motivations.

275.    As such statements suggest, the action is carried out because of the employees' *perceived* support for partisan causes or ideologies inconsistent with a legitimate reduction in force and in violation of the employees' freedom against discrimination for lawful political activity.

276.    Plaintiffs have also faced discrimination and retaliation in their efforts to secure new federal employment at similar grades and positions, with similar benefits.

277.    Harm associated with the fact that they were perceived to be in DEI or DEIA, or that they worked at USAID, is widespread given the open hostility of the Administration and its political employees to those who have been terminated through a RIF.

**J.    The Agency denied Plaintiffs their rights under the CSRA**

278.    Both civil and foreign service employees may only be removed for conduct or performance-based issues.

279.    Such removals require notice and an opportunity to be heard.

280.    A federal employee is entitled to a written form of notice of conduct or performance deficiencies.

281.    When removal is to occur, the employee must be given written charges and specifications, and the burden is on the agency to establish the veracity of its allegations.

282.    An employee is entitled to counsel and to present both a written and oral reply.

283.    Following that reply the employee is entitled to a written decision establishing the basis for the decision.

284.    The employee may then appeal that decision on the merits to the MSPB.

285.    If the employee alleges that the action is also predicated on discriminatory intent, they may bring the full nature of the termination on both the merits and the motives to the MSPB under a mixed case appeal.

286.    The Plaintiffs were not provided with any written proposing letter, were not granted an oral or written reply, and were not provided with any decision letter that addressed the merits of their termination.

287.     The employees were not advised of any rights to challenge their terminations.

288.     This lack of substantive and procedural due process rights is both independent violation of law and proof of discrimination, retaliation, and reprisal and evidence of a hostile work environment.

289.     The failure to follow procedures was not negligent but intentional, in their zeal to eradicate USAID, Defendants did, individually and in combination, conspire to denigrate and humiliate Plaintiff and other USAID employees.

290.     The claimed RIF was an afterthought and a sham; the real intention was to fire the employees and to start with those employees like the Plaintiffs who were assigned duties that the Executive Branch considered odious.

291.     However, the real purpose of the decision to dismantle USAID and terminate Plaintiff was to establish a precedent for the unilateral and illegal termination of federal employees generally.

292.     Plaintiffs suffered harm as a result of this termination which is born out of animus and hostility to civil rights law and EEO regulations.

293.     Plaintiffs have suffered compensatory and consequential harm as the foreseeable result of this unlawful act, including but not limited to, pecuniary out-of-pocket cost of seeking reemployment and relocation, and non-pecuniary costs, including physical and emotional distress and suffering and damage to personal and professional reputation.

294.     Plaintiffs also seek compensation for emotional distress under Title VII to the maximum amount authorized at law.

**K.  DOGE's Shadowy Role in the Terminations**

295.    On information and belief, Elon Musk and members of DOGE identified Plaintiffs as being involved in DEI and DEIA activities.

296.    Musk and DOGE are believed to have targeted USAID because USAID had investigated certain Musk business related activities.

297.    It is uncertain whether Musk or DOGE had any legitimate authority to participate in the decision-making related to USAID.

298.    On information and belief, DOGE officials accessed Privacy Act protected and confidential USAID employee files.

299.    On information and belief, such officials ran search terms to identify DEI and DEIA positions.

300.    On information and belief, DOGE sought to identify the political and ideological stances of employees, including Plaintiffs at USAID.

301.    DOGE officials were quoted as hoping to abolish the Civil Rights Office of the USAID itself.

302.    The efforts directed at Plaintiffs, aside from possibly intentionally interfering with their employment, were directed at them because of their actual or perceived roles in enforcing and enhancing the civil rights laws that protected racial and ethnic minorities, persons whose origins were outside the United States, women, people of differing sexual orientations, and persons with physical and mental impairments.

303.    On information and belief, DOGE officials combined and conspired with each other and with Administration officials, to identify employees for initial termination and that these employees included Plaintiffs.

304. On information and belief, DOGE officials combined and conspired with each other and with Administration officials, to send notices to employees, including Plaintiffs, placing them on enforced leave, and then selecting them for removal on the date of April 7, 2025.

305. On information and belief, DOGE officials combined and conspired with each other and with Administration officials, to conceal their interference role in the decision to place Plaintiffs on enforced administrative leave and then to terminate them from employment.

306. On information and belief, DOGE officials took similar actions to identify other USAID employees for placement on administrative leave or termination from employment based on their perceived or actual partisan beliefs or their support for the Nation's civil rights laws.

307. DOGE intentionally hid its involvement in the termination of Plaintiffs. It concealed its identification of Plaintiffs roles and its involvement for identifying them first for administrative leave.

308. To the extent that DOGE personnel were acting in some form of governmental capacity, they are subject to the federal sector EEO laws and procedures, in the same manner as a federal employee.

309. On information and belief DOGE officials, acting alone or in combination with each other or with Administration officials, sponsored the adverse actions against Plaintiffs as discriminatory acts or in retaliation and reprisal for Plaintiffs' support for the civil rights laws.

310. On information and belief, DOGE officials, acting alone or in concert sponsored the adverse actions against Plaintiffs in retaliation and reprisal for Plaintiffs' support for the civil rights laws.

311. On information and belief, DOGE personnel, acting alone or with each other, or with Administration officials, terminated senior USAID employees who opposed their illegal acts.

L.      **Additional Statements from the Executive Branch confirm the Illegality of the Actions**

312.    On January 30th, 2025, President Trump appointed Secretary of State, Marco Rubio, as the Acting Administrator of USAID.

313.    In an interview on April 8, 2025, Secretary Rubio stated that the USAID contracts that were terminated were ones that promoted the "domestic policies of the far left" and amounted to "cultural imperialism." *Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr.,* U.S. Dep't of State (Apr. 8, 2025), https://www.state.gov/secretary-of-state-marco-rubio-with-donald-trump-jr-of-triggered-with-don-jr/.

314.    Secretary Rubio also conflated the Plaintiffs' lawful work on enforcing the civil rights laws and regulations at the Agency with support for a specific political ideology.

315.    Rubio oversaw not only the termination of Plaintiffs, but also the mass termination of virtually all USAID personnel including limited appointment employees, personal service contractors, and probationary employees.

316.    In April 22, 2025, Secretary Rubio once again reiterated that, what was labeled and sold as reorganization, was instead intended to stifle any "anti-woke" work and noted that "[t]o transfer the remaining functions of USAID," to "monstrosity of bureaus" who carried out diversity work, "would be to undo DOGE's work to build a more efficient and accountable government." *See* Dept. of State, *A New State Department to Meet the Challenges of a New Era* (Apr. 22, 2025).

317.    The actions were done with intentionality and cruelty for the express purpose of traumatizing the employees, denigrating their federal service and personal integrity, and subjecting them to a prolonged campaign of severe, pervasive, and hostile conduct.

318.    The use of targeted abuse is not hyperbole, the strategy for this attack was set forth by the OMB Director, Russell Vought, who stated: "We want the bureaucrats to be traumatically

affected…when they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains…We want to put them in trauma." ProPublica, *The October Story That Outlined Exactly What the Trump Administration Would Do to the Federal Bureaucracy* (Mar. 20, 2025), https://www.propublica.org/article/propublica-russell-vought-prophetic-trump-second-term.

319.    On information and belief, Rubio identified USAID employees for termination and that these employees included Plaintiffs.

320.    On information and belief, Rubio combined and conspired with administration officials to send notices to employees, including Plaintiffs, placing them on enforced leave, and then selecting them for removal on the date of April 7, 2025.

321.    On information and belief, Rubio took similar actions to identify other employees, employed by USAID for placement on administrative leave or termination from employment based on their perceived or actual partisan beliefs or their support for the Nation's civil rights laws.

322.    Rubio intentionally hid its involvement in the termination of Plaintiffs, concealed its identification of Plaintiffs' roles, and its involvement for identifying them first for administrative leave.

323.    Further evidence of the politically and ideologically based nature of the terminations was expressed by President Trump, who stated that *anticipated RIFs* similar to those undertaken against USAID would be targeted against "Democrat oriented" agencies. *See* AFSCME, AFL-CIO v. OMB, No. 25-cv-08302-SI, 2025 WL 3018250 *5 (N.D. Cal. Oct. 28, 2025) (finding that plaintiffs were likely to succeed on their arbitrary and capricious claim where agencies sent out "Reduction-in-Force" notices as part of President Trump's "retaliatory and

partisan 'policy goal' " of punishing Democratic-oriented agencies during the government shutdown).

**COUNT I**

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq*.; Discrimination, Retaliation, Reprisal, and Creation of a Hostile Work Environment**

324.    Plaintiffs incorporate all preceding paragraphs.

325.    Title VII prohibits discrimination, retaliation and reprisal based on protected status and characteristics.

326.    Title VII also protects employees that take an affirmative stance against discrimination in their routine duties and beyond their routine duties.

327.    Plaintiffs were employed in functions that specifically supported the goals and objectives of the Civil Rights Acts and the EEOC regulations, and in their roles, opposed illegal practices, participated in anti-discrimination proceedings, and ensured that USAID's publication of notices or advertisements did not indicate prohibited preference or discrimination.

328.    Plaintiffs DEI and DEIA functions were designed to implement the promise set forth under the act that the Federal Government serve as an exemplary and model employer for the advancement and protection of equal opportunity in the workplace.

329.    Plaintiffs, like all members of the Office of Chief of Diversity were and are minorities, they are all female and Plaintiff Lane is an African American female.

330.    The Rehabilitation Act of 1973 protects persons with mental and physical impairments in the federal workplace.

331.    The Rehabilitation Act incorporates the standards of the Americans with Disabilities acts and prohibits discrimination, retaliation, and reprisal against persons with actual or perceived disabilities.

332. The Office of the Chief Diversity Officer was associated with and coordinated with the USAID Office of Civil Rights.

333. Plaintiffs were advocates for the rights of persons in protected classes, including race, national origin, sex, sexual orientation, and disability status.

334. The Equal Opportunity Employment laws protect not only persons in the protected classes, but those who engage in support for persons in the protected classes.

335. DEI and DEIA are merely aspects of equal employment.

336. The termination of Plaintiffs coincided with the termination of all persons in the Civil Rights Office of USAID.

337. Plaintiffs were placed on forced administrative leave and terminated from their positions as punishment for their conduct consistent with their duties which is an extension of the Civil Rights Act and entails opposing practices made unlawful by the Civil Rights Act and participating in efforts to combat discrimination.

338. Plaintiffs were placed on administrative leave, based on their actual or perceived support for the Civil Rights Act and the concept of Equal Employment Opportunity.

339. These acts were independent acts of discrimination but were also acts of retaliation and reprisal for their protected activity.

340. Separately and concurrently, the Agency and the Administration have argued that merely performing DEI and DEIA functions itself is an illegal act of discrimination. As such, the removal of Plaintiffs assignments, their placement on administrative leave, and their termination were based on a bizarre interpretation that, merely because of their roles at the Agency, they themselves were involved in discriminatory conduct.

341. The terminations therefore involve actions based on EEO related activity.

342. The Defendants acts also had a disparate impact on protected classes as all of the members of the Office of the Chief Diversity Officer were members of protected classes, including Plaintiffs.

343. On information and belief, Defendants knew or should have known that the acts taken against Plaintiffs and those in DEI and DEIA related positions would disproportionately impact persons in protected classes.

344. Assuming the policy was even legitimate and neutral, Defendants' abolition of DEIA, DEIA and the Civil Rights Offices had both disparate impact on persons of protected classes and amounted to disparate treatment of Plaintiffs.

345. The adverse actions combined to form a mixed-case, where the Plaintiffs were constructively suspended, removed from the workplace, and ultimately terminated without cause, because of their support for civil rights and federal EEO law.

346. Under federal EEO laws, a negative change in the terms, conditions and benefits of employment is actionable as a form of discrimination retaliation and reprisal, including forced placement on administrative leave, improper termination, constructive termination, and constructive suspension when they are disguised as a RIF.

347. Plaintiffs were terminated from their positions to suppress Plaintiffs' good faith, reasonable belief that the Agency practices violated Title VII.

348. Plaintiffs job functions were perceived as, or actually did, protect and advance the rights of racial and ethnic minorities, persons of national origin outside the United States, women, people of differing sexual orientations, and persons with physical and mental impairments.

349. USAID and the agents acting in concert with USAID made public statements contemporaneous with the adverse action that establishes a causal connection between awareness

of Plaintiffs' protected activity and the adverse action, associating Plaintiffs' work (crudely characterized as DEIA work) with criminal and immoral activity. *Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245, 1246–47 (D.C. Cir. 2011) (discriminatory statements are direct evidence of animus and hostility).

350.    The Defendants did not have a legitimate, nondiscriminatory, nonpretextual justification for the termination because the RIF as applied to Plaintiffs was not bona fide and amounted to a sham RIF.

351.    The acts of denigrating Plaintiffs and accusing them of illegal and unethical conduct created a severe, pervasive, and hostile work environment and were done in direct and intentional retaliation for actual and perceived support for anti-discrimination law.

352.    Defendants' statements and official actions were designed to harass the employees prior to terminating them, to convert the hiring, retention, and fair treatment of persons in protected classes by Plaintiffs into an act of discrimination itself, and to create a hostile work environment that no reasonable employee in Plaintiffs' position would or could believe would not result in their harassment and ultimate termination. *Ruffin v. Congressional Budget Office*, 79 F. Supp. 3d 246 (D.D.C. 2015) ("hostile work environment" occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment).

353.    The Defendants' harassment was extreme, public, sustained and illegal.

354.    As a direct and proximate result of the Defendants' violation of the Civil Rights Act Plaintiffs have suffered bodily injury, depression, emotional and physical distress, loss of reputation, humiliation and embarrassment, and have been placed in financial distress and suffered

loss of earning and benefits, impairment of earning capacity and ability to work, and these harms will continue in the future absent the Court's order.

## COUNT II
**Violation of the Administrative Leave Act**

355.     Plaintiffs incorporate all preceding paragraphs.

356.     The Administrative Leave Act as amended prevents Defendants from placing an employee on administrative leave for "more than a total of 10 workdays." 5 U.S.C § 6329a(b)(1).

357.     Defendants forced Plaintiffs to be on administrative leave from January 22, 2025, to April 7, 2025.

358.     Congress amended the Administrative Leave Act to indicate that an agency's decision to keep an employee on administrative leave for more than 10 days is an admission that the employee is subject to a disciplinary action or under investigation for misconduct.

359.     5 U.S.C. § 6329a only authorizes keeping federal employees on administrative leave for more than 10 days in special cases where employees are provided with their right to or clear evidence that the agency has "determine[d] that an extended investigation of the employee is necessary." 5 U.S.C. § 6329b.

360.     Because Congress views placement on administrative leave for more than 10 days as evidence of disciplinary action, 5 U.S.C. § 6329b(a)(9) requires that the employer's notice to the employee placed on administrative leave for more than 10 work days informs the employee of "notice period" that is "required under law of a proposed adverse action against the employee and ending on the date on which an agency may take *the adverse action*." (emphasis added).

361.     Plaintiffs' placement on administrative leave for more than ten days was:

       a.     A violation of law in its own right.

b.      An act of discrimination, retaliation and reprisal, and imposition of a hostile work environment based on Plaintiffs' protected statuses and support for EEOlaws.

c.      An unlawful adverse personnel action in that it was a constructive suspension and termination that denied Plaintiffs their duties for more than 30 days, without justification and in violation of explicit Congressional intent, and served as an admission that the termination was not a bona fide RIF but an adverse action carried out without notice and opportunity to respond.

d.      A violation of due process in that Defendants placed Plaintiffs on administrative leave for more than ten days without providing such notice and despite evidence that bolsters the Administrative Leave Act's presumption that lengthy placement on administrative leave was due to investigation of Plaintiffs' conduct.

362.    Plaintiffs suffered harm as a result of this action, including being denied the opportunity for notice and response and denied performance of their duties for more than ten days which impacted their performance review, their employment benefits, and their ability to find employment after departure.

## COUNT III
**Violation of First Amendment Right Against Political Patronage Termination**

363.    Plaintiffs incorporate all preceding paragraphs.

364.    The First Amendment to the United States protects the freedom of speech and association and prohibits retaliation based on political affiliation.

365.    That protection extends to public employees, and as such, dismissing public employees based on political affiliation or beliefs violates the First Amendment.

366. That protection extends to public employees, and as such, conditioning future public employment on political affiliation violates the First Amendment. *See e.g., Keyishian v Board of Regents of the University of the State of New York*, 385 US 589, 604 (1967) (holding that a state-mandated loyalty oath in faculty contracts violates the First Amendment).

367. Defendants dismissed the employees because of their actual or suspected political affiliation, surmising without any proof that the employees could not be trusted to conduct the new policies of the incoming administration.

368. Defendants, combined, conspired, and confederated to punish the Plaintiffs and other USAID employees based on fabulist and unsupported claims that the employees supported radical, woke or subversive beliefs and agendas.

369. These defamatory statements had no basis in reality, but even if they were true, the right of the Plaintiffs to believe a certain ideology or to support a political party is not a basis for their termination.

370. There was no objective evidence to even establish that the employees would not conduct and adhere to new policies and directives from the Administration.

371. Indeed, the Plaintiffs were employed during the first Trump Administration and complied with all duties and assignments directed to them.

372. The Administration simply concluded that Plaintiffs would oppose their agenda and punished them based on expected speech or opposition to the Executive Branch in advance.

373. This was a violation of their rights and a prior restraint of speech.

374. Contemporaneous statements by officials in charge of such decisions also indicate that Plaintiffs were terminated abruptly and without cause because Defendants could not trust the

political affiliation of these federal employees and viewed their work as indirect financial support for the Democratic Party.

375.    Public employees retain a First Amendment constitutional right that protects them from being fired because of their perceived political affiliation.

376.    On information and belief, certain employees were retained at USAID because of their political affiliation or perceived support for the Administration.

377.    On information and belief, certain employees were hired by the Department of State from USAID because of their political affiliation or perceived support for the Administration.

378.    The actions of hiring, retaining or transferring to positions of employment, certain employees based on their perceived political loyalty, while terminating others based on their perceived loyalty confirms the selective and partisan nature of the actions against Plaintiffs and others and that punishment and reward are based on actual or perceived ideological or political loyalty.

379.    The award or withdrawal of employment based on actual or perceived speech is repugnant to the First Amendment.

380.    Plaintiffs have suffered irreparable injury, loss of employment, benefits, and monetary harm as a result of the United States' violation of this First Amendment right, and this harm will continue unless and until enjoined by appropriate order of this Court.

381.    When the United States violates the First Amendment by removing federal employees, the First Amendment provides the right to reinstatement, backpay, compensatory, and other relief.

## COUNT IV
### Wrongful Termination and Violation of the
### Civil Service Reform Act through a Mala Fide (sham) RIF

382.     Plaintiffs incorporate all preceding paragraphs.

383.     The Civil Service Reform Act and the applicable regulations only authorize federal agencies to conduct a RIF for enumerated bona fide reasons: lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties.

384.     A RIF cannot be used as a disguise for an adverse action to remove an employee, and when an employee is removed through a sham RIF "for reasons personal to the employee" the RIF is improper with respect to that employee. *Mead v. Merit Sys. Protection Bd.*, 687 F.2d 285, 286 (9th Cir. 1982); *Losure v. Interstate Commerce Commission*, 2 M.S.P.B. 361, 363, 2 M.S.P.R. 195, 199 (1980).

385.     Circumstantial and direct evidence established that Defendants openly expressed dissatisfaction with Plaintiffs' perceived personal beliefs, expressed personal and political animus towards them, and wanted them removed from the Agency for reasons personal to them, even though Plaintiffs maintained skills and qualifications that can still be used at the Agency to ensure compliance with civil rights laws and EEOC regulations, however they are interpreted.

386.     A federal employee who is not subject to a reduction in force and who is not a probationary employee has a property interest in their federal employment.

387.     A federal employee cannot be removed from the federal service without written notice of the charges and specifications of the basis for that removal which set forth the conduct or performance issues upon which the proposal is based.

388.   The employee must be given 30 days advance notice of their removal and the grounds for that removal.

389.   The employee has the right to an oral and written reply before deciding official.

390.   The employee has the right to be represented by counsel and provide exculpatory or mitigating evidence.

391.   The deciding official must provide a written decision addressing the allegations and providing notice of further appeal rights.

392.   To terminate employees without these rights is a violation of due process and is harmful procedural error.

393.   Plaintiffs' termination denied them due process and was not based on any conduct or performance issue. Nevertheless the Administration claimed that Plaintiffs were engaged in actionable misconduct, which undermines the legitimacy of the reduction in force and supports a claim that they were removed for the perception that they were engaged in illegal activity that did not promote the efficiency of the service and was akin to fraud.

394.   Plaintiffs have suffered harm as a result of being subjected to sham RIF because they were denied the opportunity to review and respond to an individualized assessment of their performance and experience.

395.   Plaintiffs seek reinstatement, back pay and benefits and injunctive relief.

### COUNT V
### Violation of Constitutional Due Process under *Accardi v. Shaughnessy*

396.   Plaintiffs incorporate all preceding paragraphs.

397.   The Agency actions were in flagrant violation of their own rules and regulations and reflected a wholesale violation of due process.

398.    When agencies adopt rules, regulations, and policies that "safeguard individuals []
against unlimited agency discretion in hiring and termination" they may not subsequently "relax
or modify" those obligations in a manner that prejudices the employees. *Lopez v. FAA*, 318 F.3d
242 (D.C.Cir.2003).

399.    When agencies fail to follow regulations, guidance, and policies that they have
voluntarily adopted, the court has the duty to enforce the agency obligations against the agency as
a matter of constitutional due process, even when the underlying decision involves exercise of
agency discretion. *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (finding that agencies
must follow their own rules, even gratuitous procedural rules that limit otherwise discretionary
actions.") (*citing Accardi v. Shaughnessy*, 347 U.S. 260 (1954))

400.    The *Accardi* principle applies both where an agency fails to follow its own existing
valid regulations and where dismissal from federal employment falls "substantially short of the
requirements of the applicable departmental regulations," *Vitarelli v. Seaton*, 359 U.S. 535, 545
(1959).

401.    USAID was obligated to follow its own regulations which hold that all personnel
programs at the Agency "must be administered without discrimination on the basis of," among
other things, "political affiliation." 3 FAM 1212.1.

402.    Similarly, ADS Chapter 418 ("Merit Staffing Program for Civil Service (CS)
Employees") directly implements the merit principles of 5 USC § 2301(b). *See* ADS 418.1 ("This
chapter meets the requirements for a merit plan contained in 5 C.F.R. § 335. 103 and established
a systematic means of selection based on merits in accordance with 5 U.S.C § 2301, Merit Systems
Principles and 5 U.S.C § 2302, Prohibited Personnel Practices").

403.    USAID was therefore required to adhere to 5 U.S.C. §§ 2301(b)(2) and (b)(8)(A) which command the Agency to refrain from any adverse decision that is influenced by either the employees "political affiliation," (b)(2), or carried out for "partisan political purposes," (b)(8)(A).

404.    USAID violated its own regulations by terminating Plaintiffs in a decision that was influenced and animated by Plaintiffs' perceived political affiliation and was conducted for "partisan political purposes," and went as far as labeling Plaintiffs' perceived political affiliation and conduct as criminal.

405.    When "it seems probable that [Plaintiff] was disciplined at least in part because the deciding official mistakenly believed that [Plaintiff's] misconduct was in violation of the law, it is necessary to know what conclusion the decision makers would have reached, and what penalty they would have imposed, if the possibility that the conduct was criminal was removed from consideration." *Doe v. Dep't of Justice*, 565 F.3d 1375, 1383 (Fed. Cir. 2009).

406.    Plaintiffs were prejudiced as result of this decision because the Defendants intruded a moral judgment on Plaintiffs' activities, labeling them as criminal and immoral, and attached social stigma and badge of infamy to Plaintiffs before terminating them and conducted no analysis as to whether Plaintiffs would be terminated if the incorrect assumption that their work was criminal was removed from consideration.

407.    The dismissal imposed this badge of infamy, disqualified the Plaintiffs from any further Federal employment, damaged their prospects for private employment, and fixed upon them the stigma of an official defamation of character.

408.    Plaintiffs' termination must be overturned as a violation of constitutional due process under *Accardi*.

## COUNT VI
### *Ultra Vires* Termination

409.    Plaintiffs incorporate all preceding paragraphs.

410.    Congress has not authorized the Defendants OPM, OMB, or DOGE, or any of the officials within these offices to terminate USAID employees because their work is related to the undefined term DEIA.

411.    Congress has not authorized the Defendants OPM, OMB, or DOGE, or any of the officials within these offices to impose disciplinary action on USAID employees for conduct perceived as immoral or criminal because of association with DEIA.

412.    Defendants OPM, OMB, and DOGE authorized and directed the Plaintiffs' termination from USAID and worked to impose such disciplinary action on Plaintiffs and other DEIA employees at USAID for enforcing civil rights laws and regulations.

413.    The President's executive orders did not authorize the termination or placement on administrative leave of any USAID employees including Plaintiffs.

414.    It remains unclear as to who actually terminated Plaintiffs, under what authority and for what specific rationale other than their association with the vague concept of DEAI and DEAI.

415.    When an executive official acts ultra vires, "courts are normally available to reestablish the limits" on lawful exercise of authority. *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988*); see also American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (upholding jurisdiction over claim that a postmaster acted ultra vires, as "[o]therwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law").

416. When agency decision regarding termination purport to be from the official with authority to make such decision but it is actually made by someone else without the responsible official's authority, the decision is viewed as an ultra vires act that must be reversed." *See Litton v. Dep't of Justice*, 2011 WL 12505419 (MSPB Aug. 1, 2011).

417. Plaintiffs are entitled to have the termination decision reversed because the decision was made by officials with no authority to make such decision.

## COUNT VII
### Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (B), and (C), Arbitrary, Capricious, and Contrary to Law and Constitution

418. Plaintiffs incorporate all preceding paragraphs.

419. USAID is a federal agency within the meaning of the APA. 5 U.S.C. § 551(1).

420. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

421. Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

422. Under the APA, a court shall "hold unlawful and set aside agency action" that is in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

423. The decisions to place Plaintiffs on forced administrative leave and terminate Plaintiffs is a final agency action subject to APA review because it "mark[s] the consummation of the agency's decision-making process," and it impacts "rights or obligations...from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

424. The termination decision was arbitrary and capricious under 706(2)(A) because it was pretextual and detached from review of Plaintiffs' individual performance. *See Doe v. Hampton*, 566 F.2d 265, 271 n.15 (D.C. Cir. 1977) (the administrative record reflects arbitrary and capricious decision-making when "there is no rational connection between the grounds charged and the interest assertedly served by proceeding against the employee.").

425. The termination decision was "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B) because it violated the Plaintiffs' First Amendment rights to associate with the political party of their choice and was based on political patronage.

426. The termination decision was in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C) because it violated the Plaintiffs' rights under the Administrative Leave Act and the applicable provisions of the CSRA, including statutes governing agency termination of employees for cause based on performance (5 U.S.C. § 4303(a); 5 U.S.C. § 7513(a)), and agency layoffs ("reductions in force, or "RIFs") (5 U.S.C. § 3502).

427. The termination decision, which removed Plaintiffs from employment, was never supported or even explained. The Plaintiffs were removed first from their substantive duties and then from their positions, by unidentified decision makers for unexplained reasons. They were left to guess at the actual basis of their removal, which occurred months before other USAID employees and were only told, largely through office gossip that they were being fired for being involved in unidentified and vaguely explained concepts of DEI and DEIA. These explanations were completely wanting of substance.

428.     There can be few matters more expressive of an arbitrary and capricious decision than one which has no factual basis, is based on unjustified and amorphous perception, where the decision makers remain opaque and the justification is hidden behind a cynical and belated pretext.

429.     The arbitrary and capricious nature of the actions is compounded by the gleeful cruelty that accompanied it, replete with a multi-billionaire wielding a chain saw, while making public statements about how an agency was destroyed out of political retaliation.

430.     The arbitrary and capricious nature was also evident form the executive orders that simply redefined a concept, Diversity, Equity, and Inclusion or Diversity, Equity Inclusion, and Accommodation, with a sinister end. Vague language selectively deployed is proof of the arbitrary and capricious act itself since what could be more arbitrary and capricious than the removal of employees based on not on their actions or their performance than for a disdain of what they represent and a desire to concentrate power.

431.     A decision without reason is an unreasonable decision. The removal of a right to employment, enshrined in law both by statute and Supreme Court precedence, should not be swept aside, based on false, selective, and speculative claims based on the perceived thought process of the employee and not on any act they took.

432.     Plaintiffs request that their terminations be reversed and that they be restored to employment with back pay, benefits and obtain injunctive relief due to the arbitrary, capricious, and unlawful actions of the Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant relief against Defendants as follows:

A.     Restore Plaintiffs to the status quo ante that existed on January 19, 2025, and award Plaintiffs back pay, front pay, lost wages and benefits, all lost employment opportunities, promotions, assignments and retirement, health, and other benefits which they were deprived.

B.     Enter an order directing the Agency to find alternative employment for Plaintiffs within the Federal Government at the same grade, step, benefits, and seniority level, to the extent such employment in the USAID is no longer possible.

C.     Find that Plaintiffs' termination from USAID was unlawful because it violated (1) the Civil Rights Act and the Rehabilitation Act, (2) the First Amendment, (3) the Administrative Leave Act, (4) the Civil Service Reform Act, (5) amounted to an unlawful ultra vires action, (6) and violated Plaintiffs' constitutional due process, (7) and the Administrative Procedure Act;

D.     Enter an order enjoining Defendants from continuing to enforce the guidance, orders, and directions that lead to Plaintiffs' unlawful terminations.

E.     Enter an order finding that DOGE employees acted without authority and outside the scope of any federal employment or agency context in any act they engaged in that violated Plaintiffs' rights or impacted the terms and conditions of Plaintiffs' employment.

F.     Enter an order enjoining Defendants from taking any personnel action to enforce OPM guidance or any other policy that seeks to evaluate the political affiliation of future applicants for Plaintiffs' positions.

G.     Enter an order directing Defendant USAID or State Department to carry out an individualized evaluation of Plaintiffs' performance and fitness during their tenure, and for the Chief Human Capital Officer (or equivalent) of either Defendant to submit a declaration under oath and seal, stating so and providing the individualized reasoning and documentation underpinning that termination and why Plaintiffs cannot continue their work.

H.     Enter an order enjoining Defendants from rehiring for positions similar or identical to the positions for which the Plaintiffs would be qualified for without first notifying the Court and giving Plaintiffs' the chance to be restored to a similar official position.

I.     Enter an order that Defendant USAID shall update Plaintiffs' personnel files, including their SF-50s, to reflect that their termination was not performance or conduct based.

J.     Provide leave to add additional Plaintiffs by motion or any other method approved by the Court; and

K.     Award Plaintiffs actual damages for all medical treatment and care and damages for pain and suffering, and emotional distress to the maximum amount authorized by law.

L.     Awarding Plaintiffs the wages and associated benefits they are owed under their employment agreement, compensatory and consequential damages as a result of unlawful termination, attorney fees and costs, and any other relief as the Court deems just and proper in an amount to be proven at trial.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: December 3, 2025                  Respectfully submitted,

/s/ *Kevin E. Byrnes*
Kevin E. Byrnes, Esq. (D.C. Bar No. 480195)
Kiarash Rahnama Moghaddam, Esq. (D.C. Bar No. 1645325)
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T : (703) 590-1234
F : (703) 590-0366
kbyrnes@fluet.law
krahnama@fluet.law
e-file@fluet.law

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I also certify that the foregoing document is being served on Defendant's counsel of record and that service will be accomplished by the CM/ECF system.

*/s/ Kevin E. Byrnes*
Kevin Byrnes, Esq.