**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BOBBIE GREENE, *et al.*,      ) | |
|      ) | |
|    Plaintiffs,      ) | |
|      ) | Case No. 1:25-cv-04217-SLS |
| v.      ) | |
|      ) | |
| UNITED STATES AGENCY FOR      ) | |
| INTERNATIONAL DEVELOPMENT, *et al.,*      ) | |
|      ) | |
|    Defendants.      ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

LEGAL STANDARD............................................................................................................. 9

ARGUMENT ...................................................................................................................... 10

    I.    Defendants Confuse The Exhaustion Requirements In Cases Where The Court Is
        Reviewing A Final Agency Or MSPB Order With This Case—Where Plaintiffs Are
        Entitled To File Suit Because More Than 120 Days Has Passed Without A Reviewable
        Final Order .................................................................................................................... 10

    II.   Plaintiffs' Administrative Leave Act, Mala Fide Rif, *Ultra Vires* And APA Counts Are
        Not Statutorily Precluded By The CSRA Because They Are "Appealable Action[S]" That
        Have Adequately Been Channeled To The MSPB First For 120 Days ............................ 14

    III.  While Plaintiffs Have Elected To Channel And Exhaust Their Constitutional Claims
        Before The MSPB First, The Court Has Jurisdiction Over Those Constitutional Claims
        Even In The Absence Of Exhaustion Because The CSRA Cannot Strip Federal Courts Of
        Jurisdiction Over Implied Equitable Constitutional Claims When The Court's Jurisdiction
        Over Those Claims Pre-Dates The CSRA ...................................................................... 15

    IV.  Plaintiffs Have Adequately Established Standing Against All Named Defendants ......... 19

    V.   Plaintiffs Have Sufficiently Established That The Defendants Terminated Them For
        Advocacy For Civil Rights Act, Participation In Ensuring Compliance With Civil Rights
        Acts' Requirements, And Their Opposition To Discriminatory Conduct (And The Fact
        That The First Circuit May Disagree Is Irrelevant!) ...................................................... 21

    VI.  Determining Whether Plaintiffs' Administrative Leave Was Investigative Is A Question
        Of Fact To Be Resolved After Discovery Not A Motion To Dismiss Question .............. 24

    VII. Plaintiffs Have Successfully Asserted A Claim For Patronage Dismissal In Violation Of
        The First Amendment ................................................................................................... 27

    VIII.Plaintiffs Have Sufficiently Alleged That They Were Wrongfully Terminated Through A
        Sham RIF ..................................................................................................................... 29

CONCLUSION..................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Abakan v. Department of Transportation*
98 M.S.P.R. 662 (2005) ............................................................................ 29

*Alston v. Johnson*
208 F. Supp. 3d 293 (D.D.C. 2016) ........................................................... 10

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*
No. 25- cv-1780-WHA, 2025 WL 660053 (N.D. Cal. Feb. 28, 2025) ............................ 26

*Am. Fed'n of State Cnty. & Mun. Emps. v. United States Off. of Mgmt. & Budget*
807 F. Supp. 3d 1004 (N.D. Cal. 2025) ............................................................ 21

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ................................................................................. 9

*Barrett v. Whirlpool Corp.*
556 F.3d 502 (6th Cir. 2009) .................................................................... 21

*Battle v. FAA*
393 F.3d 1330 (D.C. Cir. 2005) ................................................................. 18

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ................................................................................. 9

*Branti v. Finkel*
445 U.S. 507 (1980) ................................................................................ 27

*Breiterman v. United States Capitol Police*
15 F.4th 1166 (D.C. Cir. 2021) ................................................................. 27

*Chamber of Com. of U.S. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996) .................................................................. 17

*Changji Esquel Textile Co. v. Raimondo*
40 F.4th 716 (D.C. Cir. 2022) ............................................................... 17, 18

*Dahlia v. Rodriguez*
735 F.3d 1060 (9th Cir. 2013) .................................................................. 26

*Dart v. United States*
848 F.2d 217 (D.C. Cir. 1988) .................................................................. 17

*Day v. City of Providence*
       338 F. Supp. 2d 310 (D.R.I. 2004)...................................................................... 30

*EEOC v. St. Francis Xavier Parochial Sch.*
       117 F.3d 621 (D.C. Cir. 1997) ............................................................................ 10

*Elrod v. Burns*
       427 U.S. 347 (1976)............................................................................................ 27

*Flying Food Group, Inc. v. N.L.R.B.*
       471 F.3d 178 (D.C. Cir. 2006) ............................................................................ 11

*Gandola v. Federal Trade Commission*
       773 F.2d 308 (Fed. Cir. 1985)............................................................................. 30

*Glines v. Dep't of Def.*
       No. 24-cv-1222, 2025 WL 1207085 (D.D.C. Apr. 25, 2025)............................. 11

*Gogel v. Kia Motors Manufacturing of Georgia, Inc.*
       967 F.3d 1121, 1144 (11th Cir. 2020) ................................................................ 21

*Graham v. Ashcroft*
       358 F3d 931 (D.C. Cir. 2004) ............................................................................. 18

*Harris v. D.C. Water & Sewer Auth.*
       791 F.3d 65 (D.C. Cir. 2015)............................................................................... 20

*Hartman v. City of Providence*
       636 F.Supp. 1395 (D.R.I. 1986)......................................................................... 30

*Hettings v. United States*
       677 F.3d 471 (D.C. Cir. 2012) .............................................................................. 9

*Hunter v. District of Columbia*
       2d 364 (D.D.C. 2012) ......................................................................................... 26

*Keener v. United States*
       165 Ct. Cl. 334 (1964) ....................................................................................... 30

*Losure v. Interstate Commerce Commission*
       2 MSPB 361, 2 M.S.P.R. 195 (1980) ........................................................... 29, 30

*Martin v. District of Columbia*
       78 F. Supp. 3d 279 (D.D.C. 2015) ...................................................................... 22

*Misek v. City of Chicago*
    783 F.2d 98 (7th Cir.1986) ........................................................................ 30

*Park v. Howard University*
    71 F.3d 904 (D.C. Cir. 1995) ..................................................................... 13

*Phelps v. Dept. of Interior*
    4 M.S.P.B 410 (Dec. 3, 1980).................................................................... 29

*Pueschel v. Chao*
    955 F.3d 163 (D.C. Cir. 2020) ..................................................................... 9

*Rogers v. Henry Ford Health Sys.*
    897 F.3d 763 (6th Cir. 2018) ..................................................................... 26

*Rogers v. Phelan*
    2026 WL 865821 (D.D.C. Mar. 30, 2026)............................................. 10, 11

*Rutan v. Republican Party of Illinois*
    497 U.S. 62 (1990)................................................................................ 27, 28

*Talbott v. United States*
    2026 WL 1532205 (D.D.C. June 1, 2026)................................................... 20

*Tolton v. Day*
    2020 WL 2542129 (D.D.C. May 19, 2020)................................................. 22

*Trudeau v. FTC*
    456 F.3d 178 (D.C. Cir. 2006) ................................................................... 15

*United States ex rel. Accardi v. Shaughnessy*
    347 U.S. 260 (1954)..................................................................................... 6

*Vanover v. Hantman*
    77 F. Supp. 2d 91 (D.D.C. 1999) *aff'd*, 38 Fed. App'x 3 (D.C. Cir. 2002)...................... 10

*Vatel v. All. of Auto Mfrs.*
    627F.3d 1245 (D.C. Cir. 2011*)* ................................................................ 23

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*
    429 U.S. 252 (1977).............................................................................. 19, 20

*Webster v. Doe*
    486 U.S. 592 (1988)................................................................................... 16

v

*Wilson v. Pena*
     79 F.3d 154 (D.C. Cir. 11966) ....................................................................................... 11

*Winslow v. Pulaski Academy*
     448 F.Supp.3d 197 (N.D.N.Y. 2020) ............................................................................. 26

**Statutes**
29 CFR §1614.102 ................................................................................................................. 6
29 CFR §§1614.103-108 ....................................................................................................... 6
5 U.S.C § 7702 ........................................................................... 11, 12, 13, 14, 15, 16, 28
5 U.S.C. § 6329 .............................................................................................................. 24, 25

**Other Authorities**
Exec. Or. No. 14151, 2025 WL 315841 (Jan. 20, 2025) ................................................... 4
Exec. Or. No. 14283, 90 FR 17543 (Apr. 23, 2025) ......................................................... 4

**Rules**
Fed. R. Civ. P. 8 .................................................................................................................... 9

**INTRODUCTION**

The chaotic and illegal destruction of United States Agency for International Development (USAID) was the bureaucratic equivalent of the issues facing the botched modifications of the Lincoln Memorial Reflecting Pool; it was based on personal whim, was chaotic, produced harmful results, and cost the American taxpayers millions of dollars because it was ill-conceived, based on false premises and done with a mixture of incompetence and cynical disdain. The Plaintiffs here, were the first victims of that myopic, ideologically fused set of actions.

Acting quickly, the Plaintiffs brought a mixed-case appeal before the Merit Systems Protection Board (MSPB) that asked two questions: who actually terminated them from their positions at USAID and on what legal basis. Relying on the public statements of the Administration and Executive Branch officials, the Plaintiffs logically conclude that they were fired because they were perceived as advocating and enforcing civil rights laws, and not part of any properly constituted reduction in force (RIF). As evidence of this, Plaintiffs detail how the terminations eschewed regulatory and statutory protections and were in fact a "sham." They further establish how the explanations for their terminations were never made clear and, indeed, who was actually behind the terminations was hidden. They detail an abuse of enforced administrative leave and a policy that conveniently closed down a section in which they were employed, made up of members of protected classes.

Plaintiffs detail how they quickly asserted their rights to the Merit Systems Protection Board and met the time-based pre-requisite of pursuing that appeal before that body, prior to asserting their rights to proceed here. They outline a myriad of violations of federal personnel law and violations of their rights to due process. Plaintiffs detail how they were denigrated, maligned,

and subject to a level of workplace harassment and reprisal that, were it committed by any single supervisor, would certainly support the Complaint for discrimination that they have filed.

The Defendants cynically contend that because the Plaintiffs are unclear who was behind their actual terminations, that their claims against a myriad of Trump Administration officials must be dismissed, although part of the very fabric of the claims revolves around the use of an ideological "star chamber" to effectuate Plaintiffs' removal. Equally disingenuous, the Defendants cite that the basis of the removal action stemmed from Presidential Executive Orders, although those orders say no such thing, nor should they have the power to effectuate personnel actions by their utterance.

Defendants also misstate the exhaustion requirement for mixed-case appeals. Further, they misconstrue the Administrative Leave Act challenge citing as a defense not a statute but an attempt by Office of Personnel Management (OPM) to undermine the statute as justification for their actions. Additionally, they show a poor understanding as to how enforced leave is an adverse and retaliatory action under Title VII and an open question exists as to whether Congress's most recent amendments rendered it a violation of law and thus a de facto adverse personnel action to place an employee on extended enforce leave for more than ten days.

These issues aside, the fundamental flaw for the Defendants is that the Defendants have become used to the idea that because the Administration says something, it must be true and uncritically accepted as true. The most glaring flaw in the motion to dismiss and one that dooms it, is that it argues the facts more than the law, and when it does argue the law, it gets it wrong. And procedurally, the Defendants ignore that at the 12(b)(6) stage of the proceedings, the issue is not proof; rather it is one of allegations (and ones that the Court is required to read in the light most favorable to the Plaintiffs, and not the Defendants). Indeed, what is most galling about the

Defendants' position is that, having hidden the actual people who conducted the actions against Plaintiffs behind an opaque door, they state to the Court that the matter should be dismissed largely because Plaintiffs cannot prove their claims. That is precisely the point of the lawsuit, to find out who did what and on what basis.

## **BACKGROUND**

Plaintiffs collectively possess more than forty years of experience in public service. Plaintiff Alzouma had served 27 years at the USAID, Plaintiff Greene 2 years, and Plaintiff Cambrel 14 years. ECF No. 1 (Compl.) ¶32, 48, 58. None of the Plaintiffs had been subject to any discipline, and they all had an unblemished track-record of excellent performance. Plaintiff Alzouma had worked at USAID as programs analyst and country desk officer for many years. Plaintiff Greene had begun her career at USAID as a curriculum developer and trainer for the U.S. Embassy, Liberia and later as a senior training and development specialist. Plaintiff Cambrel had worked at USAID in a few different capacities before her latest role, including as a Senior Executive Assistant and Scheduler to the Agency's Chief of Staff. Plaintiff Cambrel's exemplary career of operating in senior-level positions also included serving as a Senior Instructional Designer and Trainer and the back-up Division Chief for two teams and a Team Lead and Organizational Strategist. After USAID launched an Office of Chief Diversity Officer on March 14, 2022, Plaintiffs were reassigned to this office at different periods. This office was an extension of and coordinated with the USAID's Office of Civil Rights. Neither Plaintiff was assigned to a specifically designated DEI or DEIA position.

Plaintiffs' work in these offices involved enforcing the requirements of the Civil Rights Act. Plaintiffs drafted and implemented action plans that reduce barriers and enhance opportunities for minorities and minority-serving institutions in and with USAID; they ensured USAID

complied with executive orders that require federal agencies to work with minority-serving institutions, including, as an example, those defined by the Department of Education and outlined in the related Presidential Executive Orders signed by all incoming Presidents including President Trump's administration during both terms. *See* Exec. Or. No. 14283, White House Initiative To Promote Excellence and Innovation at Historically Black Colleges and Universities, 90 FR 17543 (Apr. 23, 2025). Plaintiffs crafted training policies and implemented training programs to ensure compliance with the Civil Rights Act and monitored USAID's training and outreach programs to make sure they were effectively supporting a work environment and culture that was in line with the requirements of the Civil Rights Act; they trained USAID staff, both domestically and internationally, on compliance with civil rights laws and regulations, and as part of this work, developed hiring guides for USAID's missions, bureaus, and offices to ensure compliance with policies, procedures, laws, and regulations that protect minorities; they partnered with stakeholders to advance USAID's compliance priorities in accordance with federal equal employment laws and regulations; and they ensured that USAID's operations did not directly or indirectly harm legally protected federal classes. *See* Compl. ¶ 17-68.

On January 20, 2025, President Donald Trump, signed an Executive Order titled "Ending Radical and Wasteful Government DEI Program and Preferencing." Exec. Or. No. 14151, 2025 WL 315841 (Jan. 20, 2025). This Executive Order recast working in a DEI or DEIA function as support for discrimination, without providing a definition of DEI or DEIA work. Even though this Executive Order did not authorize or order any federal agency to separate any federal employee from any agency, Defendants, collectively, proceeded to do so. In particular, the act of placing federal employees on administrative leave and subsequently terminating them, was animated by Defendant OPM. On January 21, 2025, OPM issued a Memorandum entitled: "Initial Guidance

4

Regarding DEIA Executive Orders." *See* OPM, Initial Guidance Regarding DEIA Executive Orders (Jan. 21, 2025) https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf. This memorandum directed all federal agencies to place "all employees of DEIA Offices" on administrative leave, close DEIA offices, and ask employees "if they know of any efforts to disguise these programs by using coded or imprecise language." *Id*. Defendant USAID, then, per instructions by Defendant OPM and Defendant Office of Management and Budget (OMB) stripped Plaintiffs of all employment duties, denied them access to their office space and computer systems, and placed them on enforced administrative leave because of their alleged role in DEI and DEIA programs on January 22, 2025. Compl. ¶ 129-131.

The Court can take judicial notice that on March 19, 2025, both the Department of Justice and the Equal Employment Opportunity Commission, now staffed by Administration loyalists rewrote the law on DEIA.[1]

Henceforth, *involvement in DEIA was itself a form of discrimination*. under Title VII. Defendants OPM, OMB, and USAID, in concert, sought to preclude the Plaintiffs from having any ability to even appeal these actions. *USAID terminated the entire Civil Rights Office and Equal Employment Opportunity (EEO) staff*, denied employees access to systems by which they could lodge a complaint or appeal, and failed to apprise the Plaintiffs of their rights to administratively

---

[1] The DOJ and EEOC released a joint one-page technical assistance document, "What To Do If You Experience Discrimination Related to DEI at Work." The EEOC also released a longer question-and-answer technical assistance document, "What You Should Know About DEI-Related Discrimination at Work." These documents equated support or advocacy for DEIA as an act of Title VII discrimination, as such the Administration itself established that its acts against the Plaintiffs sounded under Title VII. Thus, it appears disingenuous to argue that being terminated for support or advocacy of such matters is not cognizable under a statute that equates the work with the harm.

contest their placement on extended enforced leave, to protest the removal of their duties, or to challenge the so-called RIF in any way. Defendants terminated Plaintiffs on April 7, 2025, after two months of having them on forced administrative leave.[2]

Plaintiffs timely challenged this unlawful termination before the MSPB, and the MSPB acknowledged the receipt of the appeal on May 9, 2025. *See* Exs. M, N, O. The appeal to the MSPB is a nine-count appeal, seeking to give the MSPB the opportunity to address all relevant claims before proceeding to the federal courts. *See* Ex. A at 13-62. Count I asserts violation of the Administrative Leave Act. Count II asserts violation of the Civil Rights Act. Count III alleges an *ultra vires* violation. Count IV alleges violation of the Administrative Procedure Act (APA). Count V alleges violations of the Civil Service Reform Act and challenges the RIF as a sham RIF. Count VI alleges that the terminations constituted prohibited personnel practice in direct violation of the merit systems principals. Count VII alleges constitutional violations of First Amendment. Count VIII challenges the Agency's failure to follow the applicable procedures and its RIF regulations (a Harmful Procedural Error claim). Count IX alleges violation of the Plaintiffs' right to procedural due process under *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954).

In addition to directly challenging the violation of the Civil Rights Act, the MSPB appeal specifically identifies the claim as "mixed-case appeal" in ten instances and establishes why the Plaintiffs' MSPB appeal qualifies as a mixed-case appeal: "Since a portion of Appellants' claim cites both cognizable adverse actions and Equal Opportunity-based discrimination arising from

---

[2] This not a case where an employee is removed from a position merely because they held a title but because of their actual work in the civil rights arena, conducting a duty mandated by law. alleging that they were terminated merely for holding a title. The abolition of the entire Civil Rights Division amounted to a defenestration of the ability of the Agency to enforce the Civil Rights Laws of any employee. *See* 29 CFR §1614.102 mandating that federal agencies establish a Civil Rights Office, which then follows the regulatory mandates of 29 CFR §§1614.103-108.

violation of the Civil Rights Act, the appeal should be treated as a 'mixed case appeal'." Ex. A at 24.

From here on, Defendants and the MSPB imposed significant and unacceptable delays on the processing of the appeals that have effectively hindered a final judicially reviewable decision on Plaintiffs' claim, well past 120 days. Almost immediately after filing the appeals, USAID requested a 90-day extension of all deadlines to challenge the legality of the RIF, ironically citing, the impact of the RIF on the Agency's shortage of staff to address the appeals. *See* Ex. B. USAID's request noted that the case needed to be delayed for 90 days because USAID "is experiencing a severe staffing shortage," because Defendants, "with the exception of a single attorney," had placed "the Agency's entire team of employment attorneys," including the attorney assigned to Plaintiffs' case, "on extended administrative leave." *Id.*

Plaintiffs opposed this request and argued that Defendants' manufacturing their own inability to defend against legal challenges is not good cause to grant an extension and delay issuance of a judicially reviewable final decision. Ex. C. In fact, if anything, the Plaintiffs argued, the impact of the RIF on USAID's inability to defend its legality should serve as further evidence that Plaintiffs are entitled to relief. *Id.*

Despite this, the MSPB gave the Agency additional time to submit its Agency File. Ex. E. After filing a belated Agency File, the parties proceeded to discovery before the MSPB, and after the Agency missed its deadline to provide Agency responses to discovery requests, the Agency yet again moved for extension of time on July 18, acknowledging that it had missed the deadlines because of the same severe RIF-imposed staff shortage, and asking for another 45 days of pause. Ex. D. Without addressing the legal consequences of missing a discovery deadline, and without

7

waiting to hear from the Plaintiffs on their opposition, the MSPB granted the Agency's request for extension of time in less than an hour. Ex. F.

Plaintiffs filed their opposition after MSPB had granted the request and preserved their objections to the unjust delays imposed and endorsed by the MSPB. Ex. G. After more delay, the MSPB then issued a decision on August 27, 2025, pausing all deadlines in the appeal pending consolidation of Plaintiffs' MSPB appeal with other appeals that the Agency also classified as "DEIA" appeals. Ex. H. The MSPB did not consolidate the cases in time before a lengthy government shutdown arrived, further prejudicing administration of Plaintiffs' appeal, lasting from October 1 to November 12. Ex. I.

After the shutdown, the MSPB finally lifted its stay to consolidate the cases on November 26, reopening the case as a consolidated case, and ordering the Agency to produce a new Agency File by December 5. This time, the Defendants yet again delayed the proceedings by informing Plaintiffs on December 5, that Defendant USAID cannot comply with the deadlines because "the Appeal is being transferred to" Defendant OPM. Ex. J at 5. The Plaintiffs opposed, and the MSPB once again sided with Defendants, delaying the deadlines by another 46 days. Ex. K. Experiencing such significant unjust delays, Plaintiffs filed their claim in this court on December 2, 2025, when 207 days had passed since filing the MSPB appeal without the MSPB issuing a final judicially reviewable decision on Plaintiffs' mixed-case appeal. [3]

---

[3] Over Plaintiffs' opposition the MSPB continues to adjudicate the appeal, citing concurrent jurisdiction over Plaintiffs' claims. Currently the MSPB is considering granting the Agency four months to review documents in response to the same discovery, before even beginning to produce any material. The supplicant nature of the Board is to be expected, since the Administration removed the former Board and staffed it with handpicked appointees. "White House Secretly Swayed Board Meant to Protect Federal Workers From Unfair Firings", *NYTimes* (June 28, 2026), hhttps://www.nytimes.com/2026/06/28/us/politics/trump-firings-workers-merit-systems-protection-board.html.

**LEGAL STANDARD**

In reviewing a motion to dismiss under Rule 12(b)(6) and Rule 12(b)(1), the Court "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettings v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). Under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Court must deny the motion to dismiss if the Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claims in the complaint are facially plausible when they allow "the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The D.C. Circuit has found that the *Iqbal* pleading standard also governs all discrimination lawsuits. *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (Title VII retaliation claim requires pleading facts that "support a reasonable inference of causality" under *Iqbal*). In ruling on a Rule 12(b)(6) motion, the Court must construe "the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettings*, 677 F.3d at 476 (internal quotation marks omitted).

The Federal Rules of Civil Procedure require that a complaint only contains "a short and plain statement," of the grounds upon which the Court's jurisdiction depends, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks. *See* Fed. R. Civ. P. 8(a). In reviewing the motion to dismiss the Court considers "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis*

*Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Therefore, "where a document is referred to in the complaint or is central to plaintiff's claims, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 Fed. App'x 3 (D.C. Cir. 2002). With regards to MSPB proceedings, specifically, the Court takes judicial notice of the proceedings referenced in the Complaint for the purposes of ruling on the motion to dismiss. *See e.g., Rogers v. Phelan*, 2026 WL 865821 at \*4 (D.D.C. Mar. 30, 2026) (taking judicial notice of "the proceedings in the Federal Circuit, including Defendant's Federal Circuit Petition for Review and the MSPB Final Order," among other documents related to the proceedings referenced in the Complaint); *see also Alston v. Johnson*, 208 F. Supp. 3d 293, 298 (D.D.C. 2016) ("[A] document need not be mentioned by name to be considered 'referred to' or 'incorporated by reference' into the complaint.").

## **ARGUMENT**

### I.    Defendants Confuse the Exhaustion Requirements in Cases Where the Court is Reviewing a Final Agency or MSPB Order with This Case—Where Plaintiffs Are Entitled to File Suit Because More Than 120 Days Has Passed Without a Reviewable Final Order

Plaintiffs have alleged that they are entitled to initiate this lawsuit because more than 120 days have passed since they filed their mixed-case appeal with the MSPB. *See* Compl. ¶ 13. Defendants state that "Plaintiffs' jurisdictional and exhaustion allegations are minimal," *see* ECF No. 11 (Def.'s Mot. to Dismiss) at 19 n.3.[4] This is true, because the jurisdictional basis to file a

---

[4] Defendant's motion to dismiss includes repeated attacks on the sufficiency of the pleadings in the Complaint, even though the Government's motion only raises affirmative defenses to challenge these counts, namely exhaustion of administrative remedies. None of these challenges go to the sufficiency of the pleading because under the federal rules of procedure, Plaintiffs are not required to address or negate affirmative defenses in the complaint. *Flying Food Group, Inc. v. N.L.R.B.*,

lawsuit after expiration of 120-days of mixed-case appeal at MSPB is straight-forward and well-settled.

5 U.S.C § 7702(e)(1) reflects Congress's will to expedite review of mixed-case appeals because of the serious violations of law normally at stake (violation of the Civil Rights Act). This provision provides that mixed-case MSPB appellants have the right to initiate a lawsuit in the District Court for the District of Columbia "at any time after...the 120th day following the filing of any," mixed-case appeal, if "there is no judicially reviewable action," by MSPB. *Id*.; *see also Wilson v. Pena*, 79 F.3d 154, 166 (D.C. Cir. 11966) (Once a claim for discrimination has been pending before the Equal Employment Opportunity Commission (EEOC) for 180 days, the claimant is no longer "required to take any further action to exhaust his administrative remedies," before filing in the court). The Complaint sufficiently alleges Plaintiffs filed their appeal with the MSPB on May 7, 2025. *See* Compl. at 3. The Court can take judicial notice of the proceedings referenced in the Complaint, and the Defendants (who are parties to the proceedings before MSPB and are in possession of all documents related to that proceeding) do not dispute this date in their

---

471 F.3d 178, 183 (D.C. Cir. 2006) (plaintiff is not required to negate affirmative defenses in complaint, and allegations to avoid or defeat such defenses lie outside burden of pleading). The Complaint sufficiently alleges in short and plain form that Plaintiffs' MSPB mixed-case appeals have been pending for more than 120 days (a simple fact that the Defendants have not and cannot dispute) rendering the case justiciable. While Plaintiffs' response to motion to dismiss provides a fuller narrative of the proceedings before the MSPB to address the affirmative defense of exhaustion, the Complaint sufficiently puts the Defendants (two of whom, USAID and OPM, are direct parties to the MSPB appeal before) on notice of all proceedings, despite Defendants' contention. While the Court can take judicial notice of all proceedings referenced in the Complaint, Plaintiffs would move to amend the Complaint to add a more detailed narrative, should the Court finds it necessary to do so. *See Rogers*, 2026 WL 865821 at *4 (Mar. 30, 2026) (taking judicial notice of "the proceedings in the Federal Circuit, including Defendant's Federal Circuit Petition for Review and the MSPB Final Order," among other documents related to the proceedings referenced in the Complaint); *see also Glines v. Dep't of Def.*, No. 24-cv-1222, 2025 WL 1207085, at *3 (D.D.C. Apr. 25, 2025) (ruling on the motion to dismiss by reviewing both the allegations in the complaint and "subsequent filing").

11

motion to dismiss. Therefore, under 5 U.S.C § 7702(e)(1), Plaintiffs were entitled to file a lawsuit at any time after September 4, 2025 (when 120 days passed since filing their MSPB mixed-case appeal with no judicially reviewable action from the MSPB). In fact, today, more than a year has passed since Plaintiffs filed their mixed-case appeal, and the MSPB has (still!) not issued a final judicially reviewable action. While Congress views even a 120-day delay as a serious enough delay to open Plaintiffs' access to the district court, the Defendants wish to still deny Plaintiffs access to this court by claiming that Plaintiffs have still failed to exhaust their administrative remedies.

To achieve this, the Defendants first feign ignorance as to the status or nature of the Plaintiffs' mixed-case appeal, even though two of the named defendants (USAID and OPM) have been named-parties to the MSPB proceedings for more than a year.

The Defendants then confusingly reference a line of irrelevant cases to argue that Plaintiffs have failed to show that all their claims have been exhausted before the MSPB. *See* Mot. to Dismiss at 20-21. None of the cases cited in Section I of Defendants' motion to dismiss are relevant to the Court's jurisdictional inquiry for this case, because none of the cases involve the Court's jurisdiction to review a mixed-case appeal after 120 days has passed without a judicially reviewable decision under 5 U.S.C § 7702(e)(1). Instead, they are solely cases in which the Court was reviewing a final decision issued by either the agency or the MSPB. In both such cases, plaintiffs of course have to establish that the claims now under review before the district court were first adequately presented to the decision-maker below and are therefore incorporated in the final decision below which is what the district court is reviewing. Unlike these cases, when jurisdiction is based on lapse of 120 days without a judicially reviewable decision by MSPB, the Court exercises jurisdiction under 5 U.S.C § 7702(e)(1) which does not invoke the district court's

12

jurisdiction to review the merits of a final MSPB decision but instead defines the jurisdiction over the lawsuit as one that can be filed without regard to what was substantively exhausted below. *See* 5 U.S.C § 7702(e)(1) (noting that after 120 days, "an employee shall be entitled to file a civil action to the same extent and in the same manner as provided in section 717(c) of the Civil Rights Act of 1964...").

In simple terms, once Plaintiffs invoke the Court's jurisdiction under the basis that 120 days have passed without MSPB resolution (or 180 days at EEOC), they evoke Congress's edict that in such cases the administrative process shall be deemed exhausted by operation of law (as a result of presumptively undue and unreasonable delay); therefore, in such cases the district court should look at what the MSPB investigation reasonably would have encompassed, not merely at what claims were formally accepted or finally adjudicated, what the Defendants argue here. *See Park v. Howard University*, 71 F.3d 904, 907 (D.C. Cir. 1995) (the Court's jurisdiction in discrimination lawsuits is over the claims presented to the administrative body and those that are "like or reasonably related to the allegations . . . and growing out of such allegations."). Regardless, the Plaintiffs have actually represented all of the claims listed in the Complaint to the MSPB with sufficient explanation of each violation, *see* Ex. A (copy of initial appeal).[5] Plaintiffs have, therefore, adequately exhausted all their claims because all of their claims were both presented to the MSPB and have been pending before the MSPB for more than 120 days.

---

[5] Exhibit A is a true and accurate copy of only the narrative portions of the Plaintiffs' consolidated appeal as filed with the MSPB, and which are relevant for the Court's consideration of the exhaustion issue. Exhibit A has been modified to exclude administrative parts of that appeal package, as those portions include personally identifiable information. The Defendants USAID and OPM have access to the MSPB dockets for the Plaintiffs' MSPB appeals, including the full appeal package, and Plaintiffs will produce the full initial appeal package, should the Court order them to do so pursuant to a protective order.

13

**II.    Plaintiffs' Administrative Leave Act, Mala Fide Rif, *Ultra Vires* and APA Counts Are Not Statutorily Precluded by the CSRA Because They Are "appealable action[s]" That Have Adequately Been Channeled to the MSPB First for 120 days**

Defendants next put forward a fallacious argument: that Plaintiffs' Count II, IV, VI, and VII are statutorily precluded by the Civil Service Reform Act (CSRA) because Congress intended the CSRA (which gives MSPB jurisdiction over such claims) to be the appropriate scheme for addressing those violations, citing to a series of cases in which plaintiffs have sought to bring those claims directly to the district court, attempting to circumvent the CSRA's channeling to the MSPB by bypassing the MSPB step. Again, none of these cases are irrelevant to this case, because the Plaintiffs in this case *have indeed* first sought to channel all of the claims through the CSRA's mechanism to the MSPB first; it is the MSPB that has refused to issue a final judicially reviewable decision on the claims after more than a year.

Unlike the cases cited by the Defendants in which the district court has denied jurisdiction over similar claims when they are brought directly to the district court first, finding it to be an attempt at circumventing the MSPB channeling, here the Plaintiffs have presented all their claims to the MSPB. *See* Ex. A. And when more than 120 days has passed for a mixed-case appeal like this case, Congress has in fact endorsed, not just district court jurisdiction over the mixed-case claim, but jurisdiction over every claim that was adequately presented to the MSPB for consideration along with the mixed-case appeal: 5 U.S.C. § 7702(a) reads "the Board shall, within 120 days of the filing of the appeal, *decide both the issue of discrimination and the appealable action* in accordance with the Board's appellate procedures under section 7701 of this title and this section." Therefore, Congress by setting the 120-day deadline for the MSPB, intended to give mixed-case plaintiffs the right to initiate a lawsuit over both the issue of discrimination and all other parts of the "appealable action" to the MSPB. Therefore, to the extent that the Defendant

admits that the claims for counts two, four, six, and seven, are subject to the CSRA and must therefore be challenged by the CSRA to the MSPB, the Defendants admit that such cases are MSPB "appealable action[s]," which under 5 U.S.C. § 7702(a) are now reviewable by the Court because the MSPB has failed to decide those issues within 120 days.

For the same reason, the Court should reject the Defendants' argument that Count II, violation of the Administrative Leave Act, should be dismissed because that law does not have an unequivocal waiver of sovereign immunity, *see* Mot. to Dismiss Part II.C. Plaintiffs are not invoking the Court's jurisdiction under the ALA itself, but rather invoking the Court's jurisdiction to review all "appealable action[s]" that have been pending before MSPB for more than 120 days; the question, therefore, is not whether the ALA's text includes an unequivocal waiver of sovereign immunity but whether an ALA violation is an "appealable action," under 5 U.S.C. § 7702(a). Plaintiffs assert that it is, as any violation of the ALA is a violation of a personnel law that significantly impacts individual employees' pay and duties, and as such, any ALA violation is appealable to the MSPB, and in turn, appealable to this Court under 5 U.S.C. § 7702(a), when it is part of a mixed-case appeal that has been pending before the MSPB for more than 120 days.

> **III.** **While Plaintiffs have elected to Channel and Exhaust their Constitutional Claims Before the MSPB First, the Court has Jurisdiction Over Those Constitutional Claims Even in the Absence of Exhaustion Because the CSRA Cannot Strip Federal Courts of Jurisdiction Over Implied Equitable Constitutional Claims when the Court's Jurisdiction Over Those Claims Pre-Dates the CSRA**

With regards to Plaintiffs' constitutional claims, which include Count III (First Amendment retaliation), Count V (violation of due process under *Accardi*), and Count VI (*ultra vires* violation), the district court has independent jurisdiction that cannot be stripped away by the CSRA, like the Defendants claim, because the district court's jurisdiction over such claims pre-date the passage of the CSRA and Defendants have not identified a clear statement in the CSRA

to establish that the Court is stripped of power to review constitutional claims. *See Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (finding that the D.C. Circuit has already reasoned, that a "direct cause of action under the First Amendment" is available, as a matter of constitutional right,  to plaintiffs alleging "unconstitutional retaliation"). That is precisely what the Supreme Court held in *Webster v. Doe*, 486 U.S. 592 (1988); there, the Court rejected the Government's argument that Congress can, through statute, preclude judicial review of constitutional claims brought by Central Intelligence Agency (CIA) security officers related to their termination. The Supreme Court emphasized that "serious constitutional question[s]...would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id*. at 595. (cleaned up). While Plaintiffs here have elected to present their constitutional claims to the MSPB through the CSRA first to give channeling a chance (therefore rendering Defendants' argument moot), even if they had not, the district court, under *Webster*, is not stripped of jurisdiction to review their constitutional claims. Defendants' other targeted attacks on Plaintiffs' constitutional claims fare no better.

With regards to Count VI, Defendants point to no authority establishing that the district court lacks power to review *ultra vires* claims, instead they argue that the district court's power to review is contingent on whether "Plaintiffs have an adequate means of vindicating their rights through the MSPB and district courts via their mixed-case appeal." Mot. to Dismiss at 25. We agree. But taking Defendant's position as correct, Congress has already clearly spoken that once 120 days pass at the MSPB without the MSPB deciding "both the issue of discrimination and the appealable action" (which includes the *ultra vire* claim that was adequately presented to the MSPB), MSPB, as a matter of law, has forfeited its power to vindicate these rights. 5 U.S.C. § 7702(a). Because Congress through, 5 U.S.C. § 7702(a), has set the 120-day standard to test

16

whether or not the MSPB can adequately vindicate the claims presented to it, and because the MSPB has not addressed the Plaintiffs' *ultra vires* claims in 120 days, even under the Defendants' own position, the Court has jurisdiction to review that claim now. Regardless of the fact that the MSPB's failure to address these claims in the last year makes those claims appealable to the district court, the Court also has independent jurisdiction over these three counts as implied equitable constitutional claims. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive [official] acts ultra vires, courts are normally available to reestablish the limits on his authority.") (*quoting Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

First, as to the *ultra vires* claims, the Defendants do not, and cannot deny, that the Court continues to exercise jurisdiction over such claims, as articulated in *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022). The burden on the motion to dismiss is on the Defendants, yet, beyond citing to *Changji*, the motion to dismiss fails to outline how Plaintiffs *ultra vires* claims fall short of the precise standard articulated in *Changji*, where the Court can exercise *ultra vires* jurisdiction as long as there is no (i) express statutory preclusion of review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acted in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory. Because the Defendants' motion to dismiss fails to actually address the *Changji* test to establish that *ultra vire* claims do not meet these factors, the Court should deny Defendants' attempt to dismiss the *ultra vires* claims. But if the Court were to apply the *Changji* standard to the allegations in the Complaint, there is *ultra vires* jurisdiction. In fact, the motion to dismiss itself makes the case that there is jurisdiction to review the claims as *ultra vires* claims, under the *Changji* standard, at least to some aspects of the violations noted in the Complaint. Namely, the Complaint alleges that the Defendants collectively violated the Administrative Leave Act by

17

placing Plaintiffs on forced administrative leave for more than the ten-days (for two months in fact!) in clear violation of the Administrative Leave Act's ten-day limitation. Defendants argue in their motion to dismiss that there is no statutory cause of action for reviewing such violations, *see* Mot. to Dismiss Part II.C, without disputing the allegations in the Complaint that the Defendants "plainly act[ed] in excess of [their] delegated powers and contrary to a specific prohibition," in the ALA that is clear and mandatory. *Changji*, 40 F.4th at 722. The ALA also does not include any express prohibition on judicial review (and Defendants identify none in their motion to dismiss). Therefore, at least as to the Administrative Leave Act violations, the Defendant's own position on lack of availability for any statutory review, opens the door for the Court to exercise its *ultra vires* jurisdiction, under the test articulated in *Changji*, to remedy the Defendants' conduct which was in excess of delegated powers and contrary to the specific prohibition in the ALA to limit placement on forced administrative leave to not more than ten days.

Second, with regards to the *Accardi* claim, Defendants misrepresent dicta in *Graham v. Ashcroft*, 358 F3d 931, 933-36 (D.C. Cir. 2004) as "controlling D.C. Circuit authority," that there is no independent constitutional jurisdiction to review challenges to an agency's violations of its own regulations as violations of due process. Contrary to the Defendants' mischaracterization of *Graham*, the D.C. Circuit has always held that there is independent jurisdiction over *Accardi* violations as a matter of constitutional law. In fact, the United States' motion to dismiss, in describing what is "controlling D.C. Circuit authority," completely fails to address *Battle v. FAA*, 393 F.3d 1330 (D.C. Cir. 2005) which came after *Graham*, and where the D.C. Circuit exercised jurisdiction over an *Accardi* claim, as a matter of independent constitutional jurisdiction, in a case

18

involving a "mixed case" appeal that the agency had transferred to the MSPB. *Id.* at 1338.[6]

Therefore, the court can exercise jurisdiction over Plaintiffs' constitutional claims despite the

CSRA, even if Plaintiffs had not challenged those claims through the MSPB. Given the fact that

Plaintiffs have successfully channeled their claims, by first presenting these claims to the MSPB

as a part of their mixed-case appeal, there is no need for the Court to address that question.

IV.    **Plaintiffs Have Adequately Established Standing Against All Named Defendants**

Defendants next argue that the claims should be dismissed as to all Defendants other than

USAID because Plaintiffs have failed to allege that the violations are "fairly traceable," to the non-

USAID Defendant's allegedly unlawful conduct. Mot. to Dismiss at 30. Defendants' arguments

here are nothing but an attempt to collapse discovery, summary judgment briefing, and the trial

into one motion to dismiss. Effectively, despite the bounty of statements made by the non-USAID

Defendants, recounted in the Complaint, where they openly and publicly take responsibility for

the violations asserted in the Complaint, *see* Compl. Section V(f), the Defendants ask the Court to

dismiss all non-USAID Defendants without any discovery that would shed light on the non-

USAID Defendants actual involvement in the violations *based on their own statements*. Instead,

without citing any authority holding so, Defendants claim that open and public statements by the

non-USAID Defendants asserting that they were responsible for the conduct described in the

Complaint does not "suggest[] meaningful involvement" in the removals. Mot. to Dismiss at 31.

Contrary to the Defendants hand-waving, there is an actual legal standard for weighing the

---

[6] In a recent litigation involving the unlawful termination of intelligence agency employees pursuant to the same DEIA executive orders, Judge Trenga of Eastern District of Virginia reviewed and analyzed the D.C. Circuit's controlling authority on whether the D.C. district courts exercise independent jurisdiction over *Accardi* claims as constitutional claims, and found that they do, noting "[t]he D.C. Circuit in *Battle v. F.A.A.*, which is a 2005 decision, considered an *Accardi* claim based on the merits where there was no corresponding APA claim." *See* Ex. L. at 24.

19

probative value of public statements by agency officials in discrimination cases, and that standard was articulated by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977), where the Court held that discriminatory purpose can be inferred based the Court's "sensitive inquiry" into all "circumstantial and direct evidence" of intent, including public statements when such statements are "contemporary" to when the official decision was made. *See also e.g.*, *Talbott v. United States*, 2026 WL 1532205 *15 (D.D.C. June 1, 2026) (citing *Arlington Heights*, and rejecting the United States' self-serving attempts to discount the probative value of "numerous" public statements "demeaning transgender" people in determining the existence of invidious discriminatory intent behind agency actions). The Court should therefore reject the Defendants' attempt to absolve themselves of any involvement in agency actions, when they chose to openly boast about being directly involved. Under *Arlington Heights,* the contemporaneous public statements are key pieces of evidence establishing discriminatory intent.

This connection is even more evident in the case of Defendant OPM that has, as of the date of this filing, effectively taken over USAID's representation before the MSPB, and substituted itself as USAID—not surprisingly. *See* Ex. J (Plaintiffs' opposition to USAID notice that OPM will take over representation of MSPB matter). Even though Defendant OPM has asked the MPSB to effectively take over the United States' defense against the Plaintiffs' MSPB appeal, the Defendants here have filed a motion to dismiss feigning disassociation from all the non-USAID Defendants without informing the Court that OPM has effectively substituted for USAID in all MSPB proceedings. Defendants' arguments about lack of standing for non-USAID Defendants amounts to nothing more than United States' self-serving position that the public statements listed in the Complaint mean nothing; that question is a merit question for the Court to resolve after

20

discovery into non-USAID Defendants' conduct, not a question for the motion to dismiss stage. *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) (finding that factual disputes generally cannot be resolved on a motion to dismiss, as a court's "role is not to speculate about which factual allegations are likely to be proved after discovery"). Other courts have also found both OPM and OMB to be appropriate Defendants, and both agencies remain as defendants, in many RIF litigation lawsuits across the country right now. *See e.g., Am. Fed'n of State Cnty. & Mun. Emps. v. United States Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004, 1042–43 (N.D. Cal. 2025). Therefore, the Court should reject the Defendants' attempt to prematurely dismiss all non-USAID Defendants.

**V.    Plaintiffs Have Sufficiently Established that the Defendants Terminated Them for Advocacy for Civil Rights Act, Participation in Ensuring Compliance with Civil Rights Acts' Requirements, and Their Opposition to Discriminatory Conduct (and the Fact that the First Circuit May Disagree is irrelevant!)**

Defendants next put forward a puzzling and baffling argument that the Court should dismiss Plaintiffs' Title VII and Rehabilitation Act claims for failure to state a claim (a drastic remedy at the motion to dismiss stage) because Title VII does not protect federal employees that are terminated in retaliation for their efforts to advocate for civil rights. There is only one problem: this is not the law in the D.C. Circuit, and the Defendants solely rely on an opinion from the First Circuit to ask the District Court for D.C. to dismiss a Title VII claim, *on legal grounds*, at the motion to dismiss stage. Even though this would still be an egregious demand from the Court at the motion to dismiss stage had a number of other circuits conclusively joined the 11th Circuit, that is not even the case. In fact, Defendants themselves acknowledge that the Sixth Circuit has held the exact opposite. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513-14 (6th Cir. 2009). So has the 11th Circuit, which held in *Gogel v. Kia Motors Manufacturing of Georgia, Inc.*, that a human resources employee whose job is to advocate on behalf of aggrieved employees and protect the

21

Civil Rights Act can raise viable Title VII claims. 967 F.3d 1121, 1144 (11th Cir. 2020) ("Gogel's internal advocacy before Kia management on behalf of other employees was clearly protected conduct."). But the critical issue is that both *Barrett* and *Gogel* involve reviews of summary judgment opinions after full discovery and fact-finding regarding the scope of Plaintiffs' jobs and responsibilities, their manner of advocacy, the evidence for the reasons cited internally for their termination, and many other crucial facts that have bearing on whether or not the government has violated Title VII; they are not motion to dismiss opinions. The Court must reject the Defendants' attempt to circumvent this specific summary judgment stage legal inquiry by framing it as a failure to state a claim issue, solely because the 11th Circuit might agree with them.

Defendants next advance an equally flimsy argument that the Plaintiffs have not sufficiently alleged a disparate impact claim. To successfully plead a disparate impact claim, Plaintiffs only need to allege that the agency action had a disproportionate impact on a recognized class of minorities. Plaintiffs have done so here: they have alleged that they all worked for the Office of the Chief Diversity Officer, and that the Office of Chief Diversity Officer's closure disparately impacted women because the Office was staffed entirely by women. *see* Compl. ¶ 329, 336; *see also* Ex. A at 23 (raising the same claim before the MSPB). Without citing to any authority, the Defendants claim that, in addition to this allegation, Plaintiffs need to provide "demographic information regarding the Civil Rights Office as a whole," or allege "statistical disparity." Mot. to Dismiss at 36. This information is obviously in the Agency's possession, not the Plaintiffs. Nonetheless, the Defendants are again misapplying the pleading stage standard because they wish to resolve this case without discovery and trial. As the courts in this Circuit have frequently stated, while disparate impact plaintiffs must eventually proffer statistical evidence, "[t]his does not mean, however, that the complaint must itself include statistical evidence

22

in order to survive a motion to dismiss." *Tolton v. Day*, 2020 WL 2542129 *25 (D.D.C. May 19, 2020); *see also Martin v. District of Columbia*, 78 F. Supp. 3d 279, 314 (D.D.C. 2015) (requiring statistical evidence at the summary judgment stage after discovery).

Finally, to round-out the self-serving arguments, the Defendants argue that the public statements chronicled in the Complaint cannot serve as a basis for a hostile work environment claim. Defendants do not even address the Complaint's reliance on *Vatel v. All. of Auto Mfrs.,* where the D.C. Circuit held the exact opposite by finding that discriminatory statements are direct evidence of animus and hostility, 627 F.3d 1245, 1246–47 (D.C. Cir. 2011). Instead, the Defendants again choose to downplay the impact of such egregious public displays of animus by arguing that the "Plaintiffs do not allege the statements interfered with their work performance." Mot. to Dismiss at 38. Even though the vile statements did interfere with Plaintiffs' work performance, (the Plaintiffs were terminated based off those same statements!!) the purpose of Title VII's hostile work environment protection is not to simply tolerate harassing statements so long as there is no interference with work performance. Defendants' position effectively bars those who cannot afford to quit or leave their jobs from bringing hostile work environment claims without first quitting or leaving their jobs. Of course, the D.C. Circuit has never held such a nonsensical position, or even implied the existence of such requirement, which is why the Defendants' statement about impact on work performance is not supported by citation to any persuasive, let alone precedential, authority. In this case, the impact of the illegal statements that created the hostile work environment were blurted out by the Defendants themselves; the OMB Director Vought, who also took charge of USAID's closeout per Defendant Rubio's instructions, set forth the strategy of targeted abuse when he stated that he wished employees such as Plaintiffs to be traumatized: "[W]e want them to not want to go to work because they are increasingly viewed

23

as the villains." *See*, Stephen Engelberg, The October Story That Outlined Exactly What the Trump Administration Would Do to the Federal Bureaucracy, PROPUBLICA, (Mar. 20, 2025), https://www.propublica.org/article/propublica-russell-vought-prophetic-trump-second-term. There is no clearer admission of the desire to create a hostile work environment for Plaintiffs, and the Court should rebuke Defendants' unacceptable and shameful attempts at playing legal games to prevent the Court's investigation of a clear-cut hostile work environment claim.

VI.    **Determining whether Plaintiffs' Administrative Leave was Investigative is a Question of Fact to be Resolved after Discovery not a Motion to Dismiss Question**

Defendants argue that the Complaint fails to state a claim for a violation of the Administrative Leave Act because that Act only covers placement on administrative leave for investigative purposes and does not apply to administrative leave for other purposes. This argument fails for two reasons. First, Defendants are incorrect that the Administrative Leave Act exempts its own coverage based solely on the Agency claiming that the employee is not being placed on administrative leave for disciplinary reasons. Instead, the Administrative Leave Act creates a legal presumption that if the Agency keeps an employee on administrative leave for more than ten work days, the placement on administrative leave should be viewed as one for investigative purposes, and the ALA puts the onus on the Agency to rebut that presumption. The Administrative Leave Act of 2016, as amended, prohibits any agency from placing an employee on forced administrative leave for a period of "more than a total of 10 work days." 5 U.S.C. § 6329a.

If the administrative leave is to last more than 10 days, Congress *assumes* that the employees are subject to a disciplinary action. Because of that presumption, the plain language of 5 U.S.C. § 6329a only authorizes keeping federal employees on administrative leave for more than

10 days if the employees are provided with their right to notice or clear evidence that the agency has "determine[d] that an extended *investigation* of the employee is necessary." 5 U.S.C. § 6329b (emphasis added). As 5 U.S.C. § 6329b(a)(9) states, the notice that the Administrative Leave Act requires the agency to send to the employee who is placed on administrative leave for more than 10 work days should inform the employee of "notice period" that is "required under law of a proposed adverse action against the employee and ending on the date on which an agency may take the adverse action." *Id*. By requiring the agencies to notify employees who are on administrative leave for more than ten days of the nature of the proposed adverse action against them, the ALA creates the presumption that placement on administrative leave for more than ten days is an investigatory and an adverse action. Here, the Agency never provided the Plaintiffs with a notice that their continued placement on administrative leave was not for investigative purposes after 10 days; and in fact, all signs pointed the other way. Defendant OPM informed all federal agencies that they were closing their DEIA offices and terminating their DEIA employees, like Plaintiffs, and to notify them that they may be under investigation and would soon be subject to more discipline.

In a January 21, 2025, memo, Defendant OPM ordered the following to be distributed to employees, including Plaintiffs, while they were on administrative leave: "We are aware of efforts by some in government to disguise these [DEIA] programs by using coded or imprecise language. If you are aware of a change in any contract description or personnel position description since November 5, 2024 to obscure the connection between the contract and DEIA or similar ideologies, please report all facts and circumstances to DEIAtruth@opm.gov within 10 days," and noting that "failure to report this information within 10 days may result in adverse consequences." *See* OPM, Initial Guidance Regarding DEIA Executive Orders (Jan. 21, 2025)

25

https://www.opm.gov/chcoc/latest-memos/initial-guidance-regarding-deia-executive-orders.pdf.

Contrary to Defendants' baseless claims now, the Plaintiffs were effectively under investigative administrative leave, as the Defendants viewed their DEIA conduct as immoral, criminal, and worthy of investigation and punishment. OPM has no authority to direct and guide this kind of activity at any federal agency. *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25- cv-1780-WHA, 2025 WL 660053, at \*4 (N.D. Cal. Feb. 28, 2025) ("No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies.").

Critically, unlawful placement on administrative leave is an adverse action subject to review for the purposes of discrimination claims and Civil Rights Act violations. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1079 (9th Cir. 2013); (rejecting the argument that placement on administrative leave is not an adverse action and finding that employees can appeal "the general stigma resulting from placement on administrative leave"); *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776 (6th Cir. 2018) (reasonable jury could find that forced placement on administrative leave was an adverse action that would have dissuaded a reasonable employee from making a charge of discrimination); *Winslow v. Pulaski Academy*, 448 F.Supp.3d 197, 207-08 (N.D.N.Y. 2020) (finding that placement on paid administrative leave was an "adverse employment action" of kind required to support a Title VII employment discrimination claim, where during employee's paid administrative leave electronic access to work files were restricted thereby impacting the terms and conditions of the employment). In *Hunter v. District of Columbia*, the district court clarified the relationship between placement on paid administrative leave and adverse employment action by noting that paid administrative leave is not an adverse action *only when* it lasts only ten days, it does not result in disciplinary action being taken, and it culminates with the plaintiff returning to the same job responsibilities, pay, grade, and benefits at its conclusion. 905 F. Supp.

26

2d 364, 374 (D.D.C. 2012). Consistent with this authority, the Court has jurisdiction to review whether lengthy placement on forced administrative leave violated Plaintiffs' civil rights.

The Court should therefore reject the Defendants' argument that the Administrative Leave Act claims are inapplicable because of the nature of Plaintiffs' administrative leave.

**VII.    Plaintiffs have successfully asserted a claim for Patronage Dismissal in Violation of the First Amendment**

Defendants' next argument is that Count III must fail for failure to state a claim. Here, Defendants correctly acknowledge that Count III raises a claim for "political patronage termination," and not a First Amendment violation based on protected conduct, but go on to state, incorrectly, that "[w]hatever the theory," Plaintiffs have failed to state a claim because their allegations do not meet the four-part test *Pickering* test which requires showing that (1) Plaintiffs spoke as "citizen[s] on a matter of public concern"; (2) their "interest in commenting on matters of public concern outweigh the government's interest in promoting the efficiency of the public services it performs through its employees"; (3) their "speech was a substantial or motivating factor in prompting the retaliatory or punitive act"; and (4) they can "refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech." Mot. to Dismiss at 41-42 (relying on *Breiterman v. United States Capitol Police*, 15 F.4th 1166, 1176 (D.C. Cir. 2021) (internal quotations and citations omitted)). The *Pickering* test however, is inapplicable to a First Amendment claims for political discrimination and patronage.

Instead, Plaintiffs claims need only be on par with *Elrod*/*Branti*/*Rutan* line of cases which involve First Amendment patronage dismissals of public employees based on public statements. *See Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64-65 (1990). This only requires showing that party

affiliation or the perception of Plaintiffs' political views were a factor in why they were terminated from their position. *Branti v. Finkel*, 445 U.S. 507, 563 (1980) (holding that while certain high-level policymaking employees may be terminated after an election, career public servants may not). Because Plaintiffs did not hold high-level policymaking positions, they only need to show that they were "discharged or threatened to discharge" solely because of Defendants' perceived viewed about Plaintiffs' political affiliation or non-affiliation. *Rutan*, 497 U.S. at 62. Plaintiffs have done so: they have detailed numerous statements from Defendants that associated DEIA and DEI with a specific political affiliation (Democratic or politically left-leaning) and, by holding DEIA and certain political belief as synonyms, these statements were intended to use DEIA as shorthand to terminate Plaintiffs for their political beliefs. *See* Compl. ¶¶ 168-90 (chronicling statements that attacked USAID DEIA employees slated to be terminated, including Plaintiffs as "radically left," "far left, left-wing," and "Radical left Marxist[s]"). Defendants' only argument as to why these statements do not meet the *Elrod/Branti/Rutan* standard is that "none of the quotes suggests that USAID perceived that Plaintiffs themselves personally adhered to those views..." Mot. to Dismiss at 44. The *Elrod/Branti/Rutan* line of cases do not impose such a requirement (and Defendants cite no legal authority showing otherwise) because the First Amendment forbids government officials from even "threaten[ing] to discharge public employees solely for not being supporters of the political party in power." *Rutan*, 497 U.S. at 64.

Since the threatening statements are clearly aimed at the group that included Plaintiffs (USAID career employees and in particular those working on DEIA matters), the public statements recounted in the Complaint sufficiently establish violation of the First Amendment under *Elrod/Branti/Rutan* without the need to prove that the statements named the Plaintiffs individually.

28

**VIII.    Plaintiffs have sufficiently alleged that they were wrongfully terminated through a Sham RIF**

As stated, Plaintiffs have a mixed-case appeal that has been pending before the MSPB for more than 120 days, and in such cases the courts exercise jurisdiction to decide "both the issue of discrimination and the appealable action" under 5 U.S.C. § 7702(a). Defendants argue that Count IV, termination through a sham RIF, must be dismissed because the allegations in the Complaint undermine the claim that of termination through a sham RIF. Specially, Defendants allege that because the RIF notice states that the RIF was due to the elimination of a position and cites innocent reasons for the RIF, then the sham RIF claim must be dismissed. Mot. to Dismiss at 46. That is not the standard for evaluating whether a sham RIF occurred. Instead, the MSPB reviews, and the Court here should review, the totality of circumstances surrounding the separation to decide whether or not the Defendants intentionally manufactured false reasons to justify the termination, taking into accounts, after discovery, all probative facts, including the Defendant Department of State's role in recreating the same positions that were eliminated as part of the USAID RIF, and then hiring politically favored employees to perform the jobs that Defendants claimed were not being retained. *See e.g.*, *Phelps v. Dept. of Interior*, 4 M.S.P.B 410 (Dec. 3, 1980) (finding that a sham RIF had occurred when "new" positions were created that mirrored the ones previously eliminated when the RIF notices claimed that the RIF was due to elimination of positions). Furthermore, under MSPB and Federal Circuit law, it is the Defendants, not the Plaintiffs, that have the burden of proof and burden of persuasion to prove that the RIF was not a sham, at the motion to dismiss stage. *Losure v. Interstate Commerce Commission*, 2 MSPB 361, 2 M.S.P.R. 195 (1980). In fact, an agency must establish by preponderant evidence that it invoked the RIF regulations for an approved reason and properly implemented the pertinent regulations, in an appropriate way. 5 C.F.R. §§ 351.201(a)(2), .402, .403; *see Abakan v. Department of*

29

*Transportation*, 98 M.S.P.R. 662, ¶ 6 (2005) (concerning the proper establishment of an appellant's competitive area and competitive level).

It is well-settled law that terminating employees due to "the desire to shed the stigma of former officials," as part of a RIF, renders the RIF decision impressible. *Losure v. I.C.C.*, 2 M.S.P.B. 361 (MSPB 1980) (internal quotation omitted). The public statements recounted in the Complaint establish and corroborate this exact desire—as all officials in charge of the USAID terminations openly admitted their hostility to the former administrations and negatively associated the USAID workforce, including Plaintiffs, with that stigma. As the MSPB summarized the law regarding *mala fide* Reduction-in-force claims, "circumstantial evidence," is historically used to support such claims in addition to statements showing "open expression of dissatisfaction." *See Losure*, at 364. Most significantly, an employer may not escape liability by merely identifying an illegal termination as a reorganization. Where an impacted employee can establish that the reorganization was not carried out in good faith and was merely a subterfuge, the deference to the employer on the legitimacy of that reorganization is overcome. *Day v. City of Providence*, 338 F. Supp. 2d 310, 317 (D.R.I. 2004). "To hold otherwise would allow government officials to cry 'reorganization' in order to circumvent the constitutional and statutory protections guaranteed ... employees." *Misek v. City of Chicago*, 783 F.2d 98, 101 (7th Cir.1986); *see also Hartman v. City of Providence*, 636 F.Supp. 1395, 1410 (D.R.I.1986) ("courts cannot permit the exception to become a convenient ruse whereby a government agency, simply by affixing a label, can avoid the necessity for demonstrating 'cause' when it wishes to dismiss a particular employee").

The Complaint sufficiently shows that the RIF was "only a veil for plaintiff's summary discharge," for reasons other than legitimate reorganization cited. *Id*. at 364 (*citing to Keener v. United States*, 165 Ct. Cl. 334, 338 (1964)). The statements and circumstantial evidence recounted

in the Complaint sufficiently allege that Plaintiffs were terminated for the same reasons as openly stated by the officials actually directing their termination. *See Gandola v. Federal Trade Commission*, 773 F.2d 308, 312 (Fed. Cir. 1985) (finding that it is enough for Plaintiffs to show evidence beyond "suspicion and surmise," that bad faith was at play in plaintiffs' termination). Plaintiffs have sufficiently alleged this possibility and are entitled to further discovery on both the true reasons behind their termination and whether or not Defendants have retained Plaintiffs' positions.

Therefore, with the sufficient allegations in the Complaint establishing illicit reasons for the USAID's terminations, the Court must allow the case to proceed to discovery for a deeper investigative review of the real reasons behind the RIF.

## CONCLUSION

For the reasons stated, the Court should reject the Defendants' motion to dismiss and allow the case to proceed to discovery all on counts. Further, given that the Defendants arguments focus on the sufficiency of the allegations rather than their legality, if the Court were to accept any of their arguments, the remedy is to allow Plaintiffs leave to amend the Complaint to provide any additional factual allegations the Court deems appropriate.

Dated: June 30, 2026                                  Respectfully submitted,

*/s/ Kevin E. Byrnes*
Kevin E. Byrnes, Esq. D.C. Bar No. 480195
PATRIOTS LAW GROUP OF LYONS &
HUGHES, P.C.
2760 Eisenhower Ave, Ste 250
Alexandria, VA 22314
Telephone: 301-952-9000
Fax: 240-699-9000
KevinByrnes@patriotslaw.com

*Counsel for Plaintiffs*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

*/s/ Kevin E. Byrnes*
Kevin E. Byrnes, Esq.
