**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BOBBIE GREENE, *et al.*,

*Plaintiffs*,

v.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, *et al.*,

*Defendants*.

Civil Action No. 25-4217 (SLS)

Judge Sparkle L. Sooknanan

**MEMORANDUM OPINION**

Last January, countless firings and workforce reductions rippled across the federal government. Agencies that had long served the American people were gutted without much thought or notice. And many lawsuits followed. This case concerns three former federal employees who lost their jobs shortly after the change in administration during the elimination of the United States Agency for International Development (USAID), a federal agency founded decades earlier to administer foreign aid and humanitarian assistance. The Plaintiffs, Bobbie Greene, Dana Alzouma, and Monica Cambrel, worked in USAID's diversity office. Like countless others, they were placed on administrative leave and eventually terminated during an agency-wide reduction in force (RIF). They brought this suit to challenge those actions under a panoply of constitutional and statutory provisions, including the First Amendment, the Fifth Amendment, the Civil Service Reform Act of 1978, Title VII of the Civil Rights Act of 1964, and the Administrative Procedure Act. This Court and many others have weighed in on the current administration's unlawful efforts to fire long-serving and hardworking civil servants. And the Court acknowledges that these Plaintiffs were abruptly stripped of their duties and seemingly fired for no good reason. But the

Court is without authority to grant them the relief that they seek in this lawsuit. It lacks jurisdiction over some of their claims and the remainder fail at the pleading stage. Thus, the Court must grant the Defendants' motion to dismiss this case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## BACKGROUND

### A. Statutory Background

#### 1. The Civil Service Reform Act of 1978 and Title VII of the Civil Rights Act of 1964

There are "two statutory schemes that govern the process by which a civil servant may challenge an adverse employment action when she claims that she was not only treated unfairly but in violation of her civil rights." *Vickers v. Powell*, 493 F.3d 186, 191 (D.C. Cir. 2007). First, the Civil Service Reform Act of 1978 (CSRA) "grants civil servants . . . a statutory right to appeal adverse employment actions to the Merit Systems Protection Board" (MSPB). *Id.* Second, Title VII of the Civil Rights Act of 1964 "makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). Title VII also includes an antiretaliation provision, which "prohibits an employer from 'discriminat[ing] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

The CSRA includes special judicial-review provisions for cases in which a federal employee alleges both an adverse employment action and statutorily prohibited discrimination—

termed mixed cases. *See Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 260 (D.D.C. 2013) ("[A] mixed case is one in which the employee 'has been affected by an action which the employee . . . may appeal to the [MSPB], and alleges that a basis for the action was discrimination prohibited by' Title VII, among other statutes." (quoting 5 U.S.C. § 7702(a)(1))); *see also Robinson v. DHS Off. of Inspector Gen.*, 71 F.4th 51, 53 (D.C. Cir. 2023) (including retaliation claims in the category of mixed cases). "An employee who intends to pursue a mixed case has several paths available to her." *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999). She can first choose between filing a "mixed case complaint" with her agency's EEO office or filing a "mixed case appeal" with the MSPB. *Id.* (citing 29 C.F.R. § 1614.302(b)). "Should she elect the agency EEO route, within thirty days of a final decision she can file an appeal with the MSPB or a civil discrimination action in federal district court." *Id.* (citing 29 C.F.R. §§ 1614.302(d)(1)(ii), 1614.302(d)(3), 1614.310(a)). "If 120 days pass without a final decision from the agency's EEO office, the same avenues of appeal again become available: the complainant can file either a mixed case appeal with the MSPB or a civil action in district court." *Id.* (citing 5 U.S.C. § 7702(e)(1)(A), 7702(e)(2); 29 C.F.R. §§ 1614.302(d)(1)(i), 1614.310(g); 5 C.F.R. § 1201.154(b)(2)). "When a complainant appeals to the MSPB, either directly or after pursuing her claim with the agency EEO office, the matter is assigned to an Administrative Judge who takes evidence and eventually makes findings of fact and conclusions of law." *Id.* (citing 5 C.F.R. §§ 1201.41(b), 1201.111). But "if the MSPB fails to render a judicially reviewable decision within 120 days from the filing of a mixed case appeal, the aggrieved party can pursue her claim in federal district court." *Id.* at 639 (citing 5 U.S.C. § 7702(e)(1)(B)).

### 2. Administrative Leave Act

Also implicated here is the Administrative Leave Act of 2016 (ALA), Pub. L. No. 114-328, 130 Stat. 2461 (codified at 5 U.S.C. § 6329a *et seq.*), which Congress passed to address its concern that "agency use of administrative leave . . . ha[d] exceeded reasonable amounts[,]" *id.* § 1138(b)(1), 130 Stat. at 2461 (codified at 5 U.S.C. § 6329a note). In relevant part, the ALA provides that "[d]uring any calendar year, an agency may place an employee in administrative leave for a period of not more than a total of 10 work days." 5 U.S.C. § 6329a(b)(1). Following the expiration of the 10-day period, the ALA allows agencies to place employees on investigative leave for up to 30 work days "if an agency determines that an extended investigation of the employee is necessary[.]" *Id.* § 6329b(b)(3)(A). The ALA also authorizes the Director of the Office of Personnel Management (OPM) to issue implementing regulations. *Id.* § 6329a(c). Currently applicable OPM regulations provide that the ALA's 10-day limit applies only to placement of employees on administrative leave "for the purpose of conducting an investigation," so "[t]he 10-workday annual limit does not apply to administrative leave for other purposes." 5 C.F.R. § 630.1404(a).

## B. Factual Background

The Court draws the facts, accepted as true, from the Plaintiffs' Complaint and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

The Plaintiffs—Bobbie Greene, Dana Alzouma, and Monica Cambrel—are former USAID employees. Compl. ¶¶ 7–9, 32, 48, 58, ECF No. 1. Each worked in USAID's Office of the Administrator/Chief Diversity, Equity, Inclusion, and Accessibility Officer (A/DEIA). Compl. ¶¶ 7–9. Throughout their combined 43 years of service at USAID, *see* Compl. ¶¶ 32, 48, 58, the Plaintiffs had never been subject to any discipline by their employer, *see* Compl. ¶¶ 34, 50, 60.

The Plaintiffs were still serving at USAID on January 20, 2025, when President Donald J. Trump signed an Executive Order instructing "the Director of the Office of Management and Budget (OMB) . . . [to] coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government," including by "terminat[ing], to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions[.]" Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025); *see* Compl. ¶¶ 101–03. The next day, on January 21, the Acting Director of OPM issued a memorandum "direct[ing] all federal agencies to place 'all employees of DEIA Offices' on administrative leave" and to "close DEIA offices[.]" Compl. ¶¶ 116–17. The day after the OPM memorandum, on January 22, the "Plaintiffs were stripped of all employment duties, denied access to their office space and computer systems, and placed on enforced administrative leave," Compl. ¶ 129—as was the "entire Office of the Civil Rights" at USAID, Compl. ¶ 26; *see also* Compl. ¶ 192 ("USAID closed the DEIA office on January 22, 2025."). Just over two months later, in April 2025, the Plaintiffs were terminated from federal employment. Compl. ¶ 198.

Meanwhile, the administration undertook further efforts to shutter USAID. On February 7, 2025, "virtually the entire [USAID] was simply removed from the workplace." Compl. ¶ 27. And the next month, USAID employees received a notice stating that "the Department of State 'will seek to retire USAID's independent operation,' and that the Department will assume responsibility for whatever USAID program that is not terminated in full." Compl. ¶¶ 249–51. Eventually, "virtually all USAID personnel" were terminated. Compl. ¶ 315.

### C. Procedural Background

On May 7, 2025, the Plaintiffs appealed their terminations to the MSPB, asserting that they were terminated unlawfully and in violation of federal antidiscrimination statutes. *See* Compl. at 3. After the MSPB failed to act, *see* Compl. at 4, the Plaintiffs filed a seven-count Complaint in December 2025, alleging that their terminations were ultra vires, *see* Compl. ¶¶ 409–17, and that they violated various statutory and constitutional provisions, including Title VII and the Rehabilitation Act of 1973, *see* Compl. ¶¶ 324–54, the ALA, *see* Compl. ¶¶ 355–62, the First Amendment, *see* Compl. ¶¶ 363–81, the CSRA, *see* Compl. ¶¶ 382–95, the Fifth Amendment's Due Process Clause, *see* Compl. ¶¶ 396–408, and the Administrative Procedure Act (APA), *see* Compl. ¶¶ 418–32. The Defendants moved to dismiss the Plaintiffs' claims for lack of subject-matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defs.' Mot. Dismiss, ECF No. 11. That motion is fully briefed and ripe for review. *See* Defs.' Mem. in Supp. of Mot. to Dismiss (Mot.), ECF No. 11-1; Pls.' Opp'n (Opp'n), ECF No. 14; Defs.' Reply (Reply), ECF No. 15.

## LEGAL STANDARD

"A motion under Rule 12(b)(1) presents a threshold challenge to a court's [subject-matter] jurisdiction." *Ctr. for Biological Diversity (CBD) v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022) (cleaned up) *aff'd*, 77 F.4th 679 (D.C. Cir. 2023). A plaintiff bears the burden of establishing a court's jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). In evaluating whether a plaintiff has met that burden at the pleading stage, a court must "accept as true all of the factual allegations contained in the complaint." *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002)). "But [a] court is not limited to the allegations of the complaint and may consider

such materials outside the pleadings as it deems appropriate." *New Mexico v. Musk*, 824 F. Supp. 3d 80, 91 (D.D.C. 2026) (cleaned up).

Under Rule 12(b)(6), a court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## DISCUSSION

The Defendants move to dismiss on several grounds, some of which are jurisdictional. Starting with those arguments, the Court concludes that the Plaintiffs have exhausted their administrative remedies, but that the CSRA precludes jurisdiction over most of their claims, requiring dismissal under Rule 12(b)(1). And the Plaintiffs' remaining claims each fail to state a theory on which relief can be granted and must be dismissed under Rule 12(b)(6).

### A. Jurisdiction

The Court begins, as it must, by addressing its jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). And here, the Defendants raise a thicket of interrelated jurisdictional issues. They urge (1) that the Plaintiffs have not exhausted their claims with the MSPB and thus have no general jurisdictional basis for bringing this lawsuit, Mot. at 8–11; (2) that the CSRA precludes jurisdiction over certain of the Plaintiffs' claims, Mot. at 11–16; Reply at 6–

10; and (3) that the Plaintiffs lack standing to sue several of the named agency Defendants, Mot. at 18–21; Reply at 10–13. The Court tackles each theory in turn.

### 1. Jurisdiction over Mixed Case Appeals

The Plaintiffs invoke this Court's jurisdiction under 5 U.S.C. § 7702(e)(1), which allows a federal employee who has presented a "mixed case appeal" to the MSPB to file a civil action in federal district court if the MSPB "fails to render a judicially reviewable decision within 120 days from the filing of" that appeal. *Butler*, 164 F.3d at 639 (citing 5 U.S.C. § 7702(e)(1)(B)). A "mixed case" is one in which "a federal employee complains of a serious adverse employment action taken against him, one falling within the compass of the [CSRA], and attributes the action, in whole or in part, to bias based on race, gender, age, or disability, in violation of federal antidiscrimination laws." *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 422 (2017) (citation omitted); *see also* 29 C.F.R. § 1614.302(a)(1) (defining a "mixed case"). The Plaintiffs claim that their (allegedly) wrongful terminations were "combined with discriminatory animus[,]" creating a mixed case. Compl. ¶ 159. And they allege that the MSPB has failed to act since their appeal was filed on May 7, 2025, *see* Compl. at 3–4, thus vesting this Court with jurisdiction under Subsection 7702(e)(1), Compl. ¶ 13; Opp'n at 12. The Defendants counter with two primary arguments, neither of which succeeds.

First, the Defendants argue that the Plaintiffs fail to adequately plead administrative exhaustion, Mot. at 8–9, because their Complaint "neither attach[ed] their MSPB appeals nor identif[ied] any specific claims they asserted in those appeals," Mot. at 11. To be sure, "[g]overnment employees alleging discrimination in violation of Title VII or challenging personnel practices prohibited by the Civil Service Reform Act must exhaust administrative remedies before bringing their claims to federal court." *Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012). But the Plaintiffs included their May 2025 MSPB appeal in opposing dismissal.

*See* MSPB Appeal, Ex. A to Opp'n. ECF No. 14-1. And in evaluating a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the Court "may consider materials outside the pleadings," *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005), including the attachments to the Plaintiffs' opposition, *see, e.g.*, *CBD*, 585 F. Supp. 3d at 70–71 (considering declarations first filed as "stand-alone documents" and then filed as attachments to the plaintiffs' opposition to a Rule 12(b)(1) motion). So the Plaintiffs cured any deficiency in their Complaint by attaching the MSPB appeal to their opposition.

Second, the Defendants contend that the Plaintiffs did not first present their mixed case appeal to the MSPB, as Section 7702 requires, because their appeal lacks "reasonably specific allegations of any adverse action against [them] with a basis of prohibited discrimination[.]" Reply at 5. They claim that such "reasonably specific allegations" are necessary because "[t]he hallmark of the CSRA's mixed-case exhaustion requirement is that the agency be placed on reasonable notice of employees' claims so that it can adequately defend against those claims before any appeal to an Article III court." Reply at 5. But the Defendants offer no textual basis for their proposed pleading standard. And on its face, Section 7702 requires only that a plaintiff file a mixed case appeal with the MSPB and wait 120 days before filing suit in federal court. *See* 5 U.S.C. § 7702(a)(1), (e)(1)(B); *Butler*, 164 F.3d at 643 ("Accordingly, section 7702 allows a complainant . . . to appeal her claim to the appropriate federal district court when, after filing a mixed case appeal with the MSPB, 120 days elapse without final MSPB action.").

Moreover, the Defendants' reading of Section 7702 is in tension with the Supreme Court's holdings that Section 7702 confers district-court jurisdiction when the MSPB dismisses a mixed case on procedural grounds, *see Kloeckner v. Solis*, 568 U.S. 41, 56 (2012), or for lack of jurisdiction, *see Perry*, 582 U.S. at 423. As the Supreme Court has explained, "[t]he key to district

court review . . . [is] the employee's '*claim* that an agency action appealable to the MSPB violates an antidiscrimination statute listed in § 7702(a)(1).'" *Id.* at 431 (quoting *Kloeckner*, 568 U.S. at 56). If the MSPB does not make a decision within 120 days, that claim unlocks the door to federal court review. 5 U.S.C. § 7702(e)(1)(B). Because text and precedent do not countenance the Defendants' additional "specificity" requirement, the Court declines to adopt it.[1]

Here, the Plaintiffs have checked all the requisite boxes. In a nutshell, their Complaint alleges that they suffered termination as a result of discrimination forbidden by Title VII. Their MSPB appeal, in turn, alleged violations of the Civil Rights Act arising from "acts of discrimination, retaliation and reprisal for their actual and perceived support for civil rights[.]" MSPB Appeal at 23. And they asked the MSPB to treat their appeal as a mixed case appeal because it "cite[d] both cognizable adverse actions and Equal Opportunity-based discrimination arising from violation of the Civil Rights Act[.]" *Id.* at 24. Thus, the Plaintiffs alleged both an adverse employment action and forbidden discrimination before the MSPB, which has failed to act for over

[1] The Defendants rely on a string of district court cases to buttress their purported specificity requirement, *see* Mot. at 9, each of which is largely inapposite. In *Robb v. Rollins*, for instance, the court recommended dismissal of the plaintiff's Rehabilitation Act claim on exhaustion grounds because the plaintiff expressly withdrew that claim before the MSPB. No. 21-cv-2056, 2025 WL 1580849, at *16–17 (D.D.C. June 4, 2025), *report and recommendation adopted*, No. 21-cv-2056, 2025 WL 2851638 (D.D.C. Oct. 8, 2025). And in *Hornsby v. Thompson*, the court found that a plaintiff's failure to challenge an administrative judge's dismissal of a claim on appeal to the MSPB constituted "abandonment" of the claim that required dismissal on exhaustion grounds. No. 22-cv-1472, 2023 WL 196185, at *7–10 (D.D.C. Jan. 17, 2023). The Defendants' other authorities are similarly unavailing. *See Glines v. DOD*, No. 24-cv-1222, 2025 WL 1207085, at *6 (D.D.C. Apr. 25, 2025) (granting a motion to dismiss for lack of exhaustion where it was "unclear" that an administrative claim was even filed with the agency's EEO office); *McIver v. Mattis*, 318 F. Supp. 3d 245, 250 (D.D.C. 2018) (deeming a disability claim unexhausted when the plaintiff had "provided no information that could be read to 'express or even hint' at a disability claim" in agency proceedings (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995))); *Kelly v. Raimondo*, No. 20-cv-3203, 2022 WL 14807447, at *8 (D.D.C. Oct. 26, 2022) (dismissing certain claims on exhaustion grounds when the plaintiffs made "no [] showing or allegation" that the agency had issued any disposition of those claims).

120 days. *Cf. Hamilton*, 666 F.3d at 1349–50 (explaining that a mixed case claimant "could have exhausted his administrative remedies by presenting his claim either to the [agency's] EEO office or to the Merit Systems Protection Board"). Jurisdiction under Section 7702 requires nothing more. Thus, the Court may—at least initially—consider the Plaintiffs' mixed case appeal.

### 2. CSRA Preclusion

The Defendants next argue that the CSRA precludes district-court jurisdiction over the Plaintiffs' ALA (Count II), constitutional due process (Count V), ultra vires, (Count VI), and APA (Count VII) claims.[2] The Plaintiffs counter that this argument is "fallacious" because the MSPB failed to act on their mixed case appeal, and so Section 7702 vests this Court with "jurisdiction over every claim that was adequately presented to the MSPB for consideration along with the mixed-case appeal[.]" Opp'n at 14. The Defendants have the better of this dispute.

"[T]he CSRA is comprehensive: It regulates virtually every aspect of federal employment and 'prescribes in great detail the protections and remedies' applicable to adverse personnel actions, 'including the availability of administrative and judicial review.'" *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009) (quoting *United States v. Fausto*, 484 U.S. 439, 443 (1988)). The CSRA is also "exclusive"—"except where Congress specifies otherwise, the Civil Service Reform Act is the proper statutory vehicle for covered federal employees to challenge personnel actions by their employers." *Nyunt*, 589 F.3d at 448 (cleaned

---

[2] In a handful of sentences, the Defendants argue that the Court has no jurisdiction over Count IV. *See* Mot. at 13 (asserting that Count IV is precluded by the CSRA); Mot. at 14 n.5 (noting that Count IV arises from the same facts as Counts III and V). The Count need not consider such a threadbare theory. *See Am. First Legal Found. v. GAO*, 819 F. Supp. 3d 20, 29 (D.D.C. 2026) ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019)). But the Defendants appear to later abandon that argument anyway. *See* Reply at 6–10.

up); *see also Fornaro v. James*, 416 F.3d 63, 66–67 (D.C. Cir. 2005) (collecting cases for the proposition that the CSRA's "remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA").

One category of cases that Congress carved out from the CSRA's exclusive regime is mixed case appeals. When the MSPB fails to act on a mixed case appeal within 120 days of its filing, an employee is "entitled to file a civil action [in federal court] to the same extent and in the same manner as provided in" certain civil-rights statutes. 5 U.S.C. § 7702(e). But critically, a plaintiff brings a mixed case only when she both "complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination[.]" *Kloeckner*, 568 U.S. at 44 (citing 29 C.F.R. § 1614.302 (2012)). Federal law makes clear which actions are sufficiently "serious" to be reviewable by the MSPB: "[t]he reviewable agency actions are removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5–6 (2012) (citing 5 U.S.C. § 7512). Because the MSPB's jurisdiction includes only particular adverse personnel actions, the special procedures set out for mixed cases do not apply "when the employee either challenges a serious personnel action under the CSRA alone or attacks a less serious action as discriminatory." *Kloeckner*, 568 U.S. at 45 (citations omitted). Therefore, outside of mixed cases that combine a reviewable agency action with alleged discrimination, Section 7702 does not displace the CSRA's general preclusion of federal court jurisdiction.

Applying these principles to the Plaintiffs' ALA, ultra vires, and APA claims, it is clear that the Court lacks jurisdiction to consider them.

**a. ALA (Count II)**

The Court begins with the Plaintiffs' ALA claim. They allege that the "Defendants forced [them] to be on administrative leave from January 22, 2025, to April 7, 2025," exceeding the 10-day maximum leave set by the ALA. Compl. ¶¶ 357–62. During this time, the Plaintiffs were paid, but unable to perform their duties. *See* Compl. ¶¶ 137–39; USAID DEIA Guidance at 4, Pls.' Ex. 3, ECF No. 1-3. But placement on paid administrative leave is not an adverse action that is appealable to the MSPB under the CSRA, and therefore it is not the proper subject of district-court jurisdiction in a mixed case appeal. *See Elgin*, 567 U.S. at 5–6 (noting that 5 U.S.C. § 7512 lists five types of personnel actions appealable to the MSPB, none of which include paid administrative leave); *see also Mattern v. Dep't of Treasury*, 291 F.3d 1366, 1370–71 (Fed. Cir. 2002) (holding that the MSPB lacked jurisdiction over an employee's assignment to administrative leave). Nothing in the CSRA supports a finding that the placement on *paid* administrative leave constitutes a forbidden suspension; the CSRA expressly defines a suspension as "the placing of an employee, for disciplinary reasons, in a temporary status without duties *and pay*." 5 U.S.C. § 7501(2) (emphasis added). Thus, the Plaintiffs' placement on administrative leave is not a personnel action appealable to the MSPB.

The CSRA also precludes any other source of jurisdiction over the Plaintiffs' ALA claim. As noted above, "except where Congress specifies otherwise, the Civil Service Reform Act is the proper statutory vehicle for covered federal employees to challenge personnel actions by their employers." *Nyunt*, 589 F.3d at 448 (cleaned up). And the Plaintiffs' challenge to their placements on administrative leave is just that—a challenge to a "personnel action[] by their employer[]." *Id.*; *see also deLeon v. Wilkie*, No. 19-cv-1250, 2020 WL 210089, at *7 (D.D.C. Jan. 14, 2020) (explaining that a federal employee's "interests in employment"—including challenges to "his

placement on administrative leave, proposed removal, and ultimate termination"—"are governed under the CSRA" (citing *Fausto*, 484 U.S. at 446–47)). As the Supreme Court explained in *Fausto*, the CSRA necessarily contemplates that "disputes over adverse personnel action" should be resolved administratively by the MSPB and judicially reviewed by the Federal Circuit. *Fausto*, 484 U.S. at 449. *Fausto* applied that reasoning to hold that the Court of Federal Claims lacked Tucker Act jurisdiction over a claim under the Back Pay Act arising from a federal employee's suspension. *Id.* at 453–54. The same is true of the ALA here. Because the Plaintiffs' ALA claim arises from a personnel action taken by their federal-agency employer, the CSRA requires that it be channeled through the MSPB and reviewed by the Federal Circuit.

In sum, this Court lacks jurisdiction to consider the Plaintiffs' ALA challenge to their placement on administrative leave as part of their mixed case appeal.[3]

**b. Constitutional Due Process and *Accardi* (Count V)**

Count V of the Plaintiffs' Complaint alleges a "Violation of Constitutional Due Process under *Accardi v. Shaughnessy*." Compl. at 57. Relying on *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), the Plaintiffs allege that the Defendants' "actions were in flagrant violation of their own rules and regulations and reflected a wholesale violation of due process." Compl. ¶ 397. Specifically, they claim that USAID violated its personnel regulations by terminating them based on their "perceived political affiliation[.]" Compl. ¶ 404. And they claim that their dismissals violated constitutional due process guarantees by "attach[ing] social stigma and [a] badge of infamy to [them] before terminating them[,]" Compl. ¶ 406, "disqualify[ing] [them] from any further Federal employment, damag[ing] their prospects for private employment,

---

[3] Because the CSRA deprives this Court of jurisdiction over the Plaintiffs' ALA claim, the Court need not reach the Defendants' alternative argument that the ALA does not waive the United States' sovereign immunity. *See* Mot. at 16–18.

and fix[ing] upon them the stigma of an official defamation of character[,]" Compl. ¶ 407; *cf. O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (explaining that "the combination of an adverse employment action and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities'" can give rise to a due process violation (alteration in original) (quoting *The Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972))).

The Plaintiffs curiously present their *Accardi* and due process theories in a single count. Compl. at 57. But *Accardi* did not render a constitutional holding; the "crucial question" was whether the petitioner was deprived of "rights guaranteed him by the *statute* or by the regulations issued pursuant thereto." *Accardi*, 347 U.S. at 265 (emphasis added). The D.C. Circuit has thus long distinguished between *Accardi* claims and constitutional due process claims. *See, e.g.*, *Battle v. FAA*, 393 F.3d 1330, 1334 (D.C. Cir. 2005) ("The district court rejected Battle's due process claim . . . Battle appeals only the denial of his *Accardi* claim."); *Lopez v. FAA*, 318 F.3d 242, 245 (D.C. Cir. 2003) (distinguishing between an *Accardi* claim and a Fifth Amendment due process claim). So the Court infers that the Plaintiffs intend to raise two distinct legal theories: an *Accardi* claim alleging that USAID failed to follow its personnel regulations and a constitutional due process claim arising from the alleged stigma imposed by the Plaintiffs' terminations from USAID. *Accord* Mot. at 11–12 (noting that the *Accardi* violation alleged in Count V of the Plaintiffs' complaint is "paired with what appears to be a liberty interest Due Process claim"); Mot. at 36 (same). And it considers each claim separately.

The Defendants contest the Court's jurisdiction over the Plaintiffs' *Accardi* claim only, relying on the D.C. Circuit's holding in *Graham v. Ashcroft* that "the CSRA precludes judicial review of [a] claim that the [agency] violated its own regulations in taking personnel action[.]"

358 F.3d 931, 935 (D.C. Cir. 2004); *see* Mot. at 15–16. The Court agrees that *Graham* forecloses jurisdiction over the Plaintiffs' *Accardi* claim.

*Graham* involved an FBI agent's challenge to his censure on the basis that the FBI violated its own regulations. 358 F.3d at 931. The plaintiff there relied on the Supreme Court's decision in *Vitarelli v. Seaton*, 359 U.S. 535 (1959), which held that even agencies vested with broad discretion must follow their own regulations. *See id.* at 539. The D.C. Circuit concluded that the plaintiff's claim that the FBI had violated its own regulations was precluded by the CSRA. *Graham*, 358 F.3d at 935. It reasoned that "[i]t is no answer to invoke the principle that agencies must follow their own regulations," noting that the Supreme Court had rejected that identical principle in *Fausto*. *Id.*

Perhaps recognizing that *Graham* precludes their *Accardi* claim, the Plaintiffs point in a different direction: to *Battle v. FAA*, 393 F.3d 1330 (D.C. Cir. 2005), decided a year after *Graham*. But *Battle* is inapposite. There, the D.C. Circuit found district-court jurisdiction over a plaintiff's claim that the FAA violated its internal rules by refusing to recognize an arbitral award obtained by a federal employee after he was terminated by the agency. *See id.* at 1335. But importantly, *Battle* presented "extraordinary circumstances," *id.* at 1338—*i.e.*, the plaintiff had sued in district court seeking to enforce the arbitral award, not to challenge his termination, *id.* at 1334. To be sure, as the Plaintiffs noted in their MSPB appeal, *Battle* stated that *Accardi* "applies where dismissal from federal employment falls 'substantially short of the requirements of the applicable departmental regulations[.]'" *Id.* at 1336 (quoting *Vitarelli*, 359 U.S. at 545); *see* MSPB Appeal at 58. But because *Battle* did not address a challenge to dismissal from federal employment, that statement is best characterized as dicta. Moreover, the fact that *Battle* was merely recounting the *Vitarelli* standard further dooms the Plaintiffs' *Accardi* claim, as the D.C. Circuit squarely held in

*Graham* "that judicial review of [] personnel claims under *Vitarelli* is precluded by the CSRA." *Graham*, 358 F.3d at 935.

Accordingly, the Court agrees that *Graham* controls the disposition of the Plaintiffs' *Accardi* claim, which must be dismissed for lack of jurisdiction.

**c. Ultra Vires (Count VI)**

Next, the Plaintiffs contend that their terminations were ultra vires because while "Congress has not authorized the Defendants OPM, OMB, or DOGE, or any of the officials within these offices to terminate" or "impose disciplinary action on" USAID employees, the "Defendants OPM, OMB, and DOGE authorized and directed the Plaintiffs' termination from USAID and worked to impose such disciplinary action on Plaintiffs[.]" Compl. ¶¶ 410–12. This claim, too, is precluded by the CSRA.

"Time and again, courts have stressed that ultra vires review has extremely limited scope." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (italics omitted) (cleaned up). In the context of the CSRA, the Supreme Court has explained: "Just as the CSRA's elaborate framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA *grants* administrative and judicial review." *Elgin*, 567 U.S. at 11 (cleaned up); *see also Graham*, 358 F.3d at 934 ("[E]mployees with judicial review rights under the CSRA may not obtain judicial review of personnel actions outside the bounds of the CSRA[.]"). So the Plaintiffs cannot use their ultra vires claim to circumvent the CSRA.

Moreover, "ultra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial

review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). And here, the Plaintiffs have invoked the CSRA's provisions for judicial review of mixed case appeals to obtain judicial review. *Cf. New Mexico*, 824 F. Supp. 3d at 93–94 (concluding that the CSRA "displace[d]" district-court jurisdiction over allegations that DOGE and associated individuals acted ultra vires in firing federal workers).

Because the CSRA provides the Plaintiffs with the exclusive means of challenging their terminations, they cannot rely on ultra vires review.

**d. APA (Count VII)**

Finally, the Plaintiffs' APA claim is flatly precluded by the CSRA. As the D.C. Circuit has repeatedly recognized, "federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (first citing *Fornaro*, 416 F.3d at 66–67; then citing *Graham*, 358 F.3d at 933–35; and then citing *Carducci v. Regan*, 714 F.2d 171, 172 (D.C. Cir. 1983)); *see also Lucas v. Am. Fed'n of Gov't Emps.*, 151 F.4th 370, 384 (D.C. Cir. 2025) (explaining that the D.C. Circuit has "repeatedly concluded that plaintiffs may not circumvent the CSRA's requirements and limitations by resorting to the catchall APA to challenge agency employment actions" and collecting cases (cleaned up)). In other words, the CSRA's "comprehensive employment scheme preempts judicial review under the more general APA . . . what you get under the CSRA is what you get." *Filebark*, 555 F.3d at 1010 (cleaned up). The Plaintiffs offer no reason why these longstanding precedents do not govern here, so the Court concludes that it lacks jurisdiction over their APA claim.

**3. Standing**

The last of the jurisdictional issues is standing. To establish this Court's subject-matter jurisdiction, the "[P]laintiffs must demonstrate standing for each claim that they press against each

defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (cleaned up). To demonstrate standing, the Plaintiffs must plead that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "This means that 'at the pleading stage,' 'plaintiffs are required only to state a *plausible* claim that each of the standing elements is present.'" *Henkel v. U.S. Dep't of Educ.*, No. 24-cv-1676, 2025 WL 2049267, at *4 (D.D.C. July 22, 2025) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017)).

Here, the Defendants challenge the Plaintiffs' standing to sue the non-USAID Defendants, including the Department of State, OMB, OPM, DOGE, and officials at each agency. *See* Mot. at 18–21. In short, the Defendants argue that because the Plaintiffs were fired from and by USAID, they cannot establish that their terminations were "fairly traceable" to any of the non-USAID Defendants. *See* Mot. at 19–20. The Plaintiffs counter by pointing to what they call a "bounty of statements made by the non-USAID Defendants, recounted in the Complaint, where they openly and publicly take responsibility for the violations asserted in the Complaint[.]" Opp'n at 19 (citing Compl. ¶¶ 165–200). Mindful of the "low bar to establish [] standing at the pleading stage[,]" *Attias*, 865 F.3d at 622, the Court concludes that the Plaintiffs have adequately alleged standing to sue most of the non-USAID Defendants. "Article III requires no more than *de facto* causality," *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (cleaned up), and the Plaintiffs have

plausibly alleged at this early stage that all but OMB may have played a role in directing the mass terminations of USAID employees that ultimately caused the Plaintiffs' injuries.

First consider the State Department. The Complaint alleges that USAID employees received a notice that "the Department of State 'will seek to retire USAID's independent operation[.]'" Compl. ¶¶ 250–51. The Complaint also references a March 2025 press statement from the State Department, which announced, in relevant part, that "the Department of State and [USAID] have notified Congress on [sic] their intent to undertake a reorganization that would involve realigning certain USAID functions to the Department by July 1, 2025, and discontinuing the remaining USAID functions that do not align with Administration priorities." Press Release, U.S. Dep't. of State, *On Delivering an America First Foreign Assistance Program* (Mar. 28, 2025), https://www.state.gov/on-delivering-an-america-first-foreign-assistance-program [https://perma.cc/AE46-9R9F]; *see* Compl. ¶ 249. These statements support a plausible inference that the State Department played a role in authorizing or directing the RIF that resulted in the Plaintiffs' termination. So on this record and at this stage, the Plaintiffs have sufficiently shown that their terminations were "fairly traceable" to State Department action.

As to OPM, the Plaintiffs allege that on January 21, 2025, the then-Acting Director of OPM issued a memorandum that "directed all federal agencies to place 'all employees of DEIA Offices' on administrative leave, close DEIA offices, and ask employees 'if they know of any efforts to disguise these programs by using coded or imprecise language.'" Compl. ¶¶ 116–17. Because the Plaintiffs all allege that they worked in a DEIA office, *see* Compl. ¶¶ 7–9, their claim that OPM directed all federal agencies to "place all employees of DEIA Offices on administrative leave," Compl. ¶ 117 (cleaned up), suffices to plead standing. Similarly, the Plaintiffs allege that Elon Musk, while serving as the head of DOGE, stated that it "was time for [USAID] to die" and that

he had been "working to feed USAID into the woodchipper." Compl. ¶¶ 167–70 (cleaned up). Thus, at least at the motion-to-dismiss stage, they have plausibly alleged that DOGE action led to their ultimate termination from USAID.

The same is not true of OMB. Although the Plaintiffs represent in their opposition that OMB (along with OPM) instructed USAID to place them on administrative leave in January 2025, *see* Opp'n at 5, that allegation is absent from their Complaint. At most, the Plaintiffs point to statements by OMB Director Russell Vought expressing approval of the downsizing of USAID. *See* Compl. ¶¶ 273, 318. But the mere allegation that Director Vought may have *desired* mass terminations at USAID does not necessarily imply that he (or OMB) played any role in the Plaintiffs' placement on administrative leave or termination. Accordingly, the Plaintiffs lack standing to sue OMB and Director Vought.

* * *

In sum, the Court lacks jurisdiction over all claims against the Defendants OMB and Russell Vought and over the Plaintiffs' ALA (Count II), *Accardi* (Count V), ultra vires (Count VI), and APA (Count VII) claims. Accordingly, it must dismiss those claims under Rule 12(b)(1).

### B. Merits

What remains on the merits are the Plaintiffs' claims under Title VII and the Rehabilitation Act (Count I), the First Amendment (Count III), the CSRA (Count IV), and the Due Process Clause (Count V).

#### 1. Title VII and Rehabilitation Act (Count I)

First up is the Plaintiffs' claim under Title VII and the Rehabilitation Act of 1973, which, taken together, prohibit discrimination in federal employment on the basis of "race, color, religion, sex, [] national origin[,]" or disability. 42 U.S.C. § 2000e-16(a); *see* 29 U.S.C. § 794. Title VII

also forbids employers from discriminating against any employee who "has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). Though their Complaint is less than precise on this point, the Plaintiffs appear to allege three distinct theories of prohibited discrimination: (1) "advocacy" discrimination, (2) disparate impact, and (3) hostile work environment. The Court considers each in turn.

*First*, the Plaintiffs contend that they were terminated for their efforts to advance diversity, equity, and inclusion as part of their job responsibilities at USAID. More specifically, the Plaintiffs allege that they "were advocates for the rights of persons in protected classes" who, as part of their jobs, "oppos[ed] practices made unlawful by the Civil Rights Act and participat[ed] in efforts to combat discrimination[,]" and were terminated for their advocacy in "retaliation and reprisal for their protected activity." Compl. ¶¶ 333, 337, 339. In other words, the Plaintiffs allege that they were punished "based on their actual or perceived support for the Civil Rights Act and the concept of Equal Employment Opportunity." Compl. ¶ 338.

At the outset, it is not clear that this "advocacy" theory is viable under Title VII. The First Circuit has explained that "Title VII's language, as discussed in *Bostock* [*v. Clayton Cnty.*, 690 U.S. 644 (2020)], forecloses such a theory, which essentially replaces the textual 'because of such individual's race' with the atextual 'because of such individual's advocacy for protected individuals.'" *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 272 (1st Cir. 2022). Meanwhile, the Sixth Circuit has permitted a Title VII claim that an employee was "discriminated against *because* she advocated for protected employees" to proceed. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009). The "D.C. Circuit has not chosen sides in [the] nascent circuit split" between the First and Sixth Circuits "about whether Title VII recognizes a claim to discrimination based on advocacy on behalf of a protected class member." *Sebunya v. Mayorkas*, No. 21-cv-780, 2024 WL

1076809, at *9 n.8 (D.D.C. Mar. 8, 2024). And this Court need not stake out a position here either. Even if *Barrett* is consistent with *Bostock*, the Plaintiffs' allegations in this case fall short of *Barrett*. They do not allege any specific form of advocacy on behalf of any specific employee that led to their terminations. Nor do they allege any specific action that they took to oppose an unlawful discriminatory employment practice. Instead, the Plaintiffs allege only that as part of their job responsibilities in USAID's diversity office, they were generally tasked with advancing diversity, equity, and inclusion. This bare fact, standing alone, is insufficient to plead a Title VII claim.

*Second*, the Plaintiffs allege that "[t]he Defendants['] acts also had a disparate impact on protected classes as all of the members of the Office of the Chief Diversity Officer were members of protected classes, including [the] Plaintiffs." Compl. ¶ 342. Specifically, the Plaintiffs explain that they, "like all members of the Office of Chief of Diversity[,]" are female. Compl. ¶ 329. To plead a disparate impact claim "[a]t the motion to dismiss stage, a plaintiff must plausibly allege that a disparity exists and identify a practice or policy that plausibly caused the disparity." *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 592 (D.C. Cir. 2025). "The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1086 (D.C. Cir. 2011) (cleaned up).

Here, the Plaintiffs have not carried their burden. Although they have alleged that the staff of the eliminated office of USAID's Chief Diversity Officer were all female, *see* Compl. ¶ 329, they also allege that "virtually all USAID personnel" were terminated, Compl. ¶ 315, and that "virtually the entire [USAID] was simply removed from the workplace[,]" Compl. ¶ 27. Therefore, even construing the facts as alleged in the light most favorable to the Plaintiffs, as the Court must

at the motion to dismiss stage, the Plaintiffs have offered no evidence that the mass termination of USAID employees "had a disproportionate impact on [] minorities[.]" *Greater New Orleans Fair Hous. Action Ctr.*, 639 F.3d at 1086. Thus, the Plaintiffs' disparate impact claim fails too.

*Finally*, the Plaintiffs contend that the "Defendants' statements and official actions were designed to harass the employees prior to terminating them . . . and to create a hostile work environment that no reasonable employee in Plaintiffs' position would or could believe would not result in their harassment and ultimate termination." Compl. ¶ 352. To state a hostile work environment claim, a plaintiff must plausibly allege "that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Strong v. Fort Myer Constr. Corp.*, No. 25-cv-1011, 2025 WL 2643457, at *4 (D.D.C. Sep. 15, 2025) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)). And determining the existence of a hostile work environment requires the Court to "look[] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "For example, 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *George*, 407 F.3d at 416 (quoting *Faragher*, 524 U.S. at 788). Moreover, the conduct "must create an environment that is 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Warren v. Kennedy*, No. 25-cv-

1880, 2026 WL 1983627, at *9 (D.D.C. July 9, 2026) (quoting *Faragher*, 524 U.S. at 787). The Plaintiffs have not made that robust showing.

To support their claim, the Plaintiffs point to public statements from government officials criticizing USAID employees, including those engaged in diversity, equity, and inclusion work. They rely, for instance, on a 2025 news article reporting on a 2023 speech by Russell Vought (who later became the Director of OMB). *See* Opp'n at 23–24. In that speech, Mr. Vought stated: "We want the bureaucrats to be traumatically affected . . . when they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains . . . We want to put them in trauma." Compl. ¶ 318. They also point to statements by Secretary of State Marco Rubio during his tenure as Acting Administrator of USAID that criticized USAID as promoting the "domestic policies of the far left," among other charges. Compl. ¶ 313; *see also* Compl. ¶¶ 165–91 (documenting other public statements).

These statements are an affront to hardworking federal employees who have served the American people with honor. But on their own, they do not carry the Plaintiffs' burden of pleading a hostile work environment. For starters, the Plaintiffs do not explain how these statements are "discriminatory," as required to show a Title VII claim. *Baloch*, 550 F.3d at 1201. Moreover, the Plaintiffs do not allege the effect of these statements—many of which were made *after* they were removed from the workplace—on their work environment. At bottom, the Plaintiffs fail to plausibly allege that the statements recounted in their Complaint had any effect on their work environment at all, much less one that was sufficiently "extreme" to constitute "a change in the terms and conditions of employment.'" *Faragher*, 524 U.S. at 788.

Because each of the Plaintiffs' Title VII theories fails, the Court must dismiss their Title VII claim under Rule 12(b)(6).

**2. First Amendment (Count III)**

The Plaintiffs also allege that the Defendants violated the First Amendment by terminating them "because of their actual or suspected political affiliation[.]"[4] Compl. ¶ 367. To be sure, "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (characterizing *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980)). In other words, "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Rutan*, 497 U.S. at 75.

But here, the Plaintiffs' Complaint alleges nothing about their "political affiliation or support[.]" *Id.* While the Plaintiffs point to statements suggesting that government officials believed that USAID workers were generally hostile to the ideological views of the current administration, *see* Compl. ¶¶ 166–67, 173–74, 188–89, they fall far short of alleging that they were removed "solely for not being supporters of the political party in power," *Rutan*, 497 U.S. at 62. Instead, the Complaint, read in the light most favorable to the Plaintiffs, establishes that the

[4] The Plaintiffs' Complaint also suggests that the hiring of certain terminated USAID employees for new jobs at the Department of State "because of their political affiliation or perceived support for the Administration" violated the First Amendment." Compl. ¶ 377. But the Plaintiffs plead this allegation solely "[o]n information and belief," without any additional evidence of the State Department's hiring practices. Compl. ¶ 377. "The D.C. Circuit has made clear that a plaintiff may plead upon information and belief 'only when "the necessary information lies within the defendant's control," and the allegations are "accompanied by a statement of the facts upon which the allegations are based."'" *Mahoney v. United States Capitol Police Bd.*, 566 F. Supp. 3d 22, 28 (D.D.C. 2022) (quoting *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 424 (D.C. Cir. 2021)). Here, the Plaintiffs have offered no facts in support of their assertion. Moreover, none of the Plaintiffs express any intention to seek employment at the Department of State, so it is difficult to see how they could be injured by any hiring policy at that agency.

current administration terminated the Plaintiffs as part of its efforts to broadly eliminate both USAID as a whole and diversity, equity, and inclusion initiatives across the federal government. Thus, rather than alleging that they were terminated because of their personal political beliefs, statements, or affiliations,[5] the Plaintiffs have alleged that they were terminated because of the jobs that they held and the agency that they worked for. But this does not give rise to a First Amendment claim. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

Accordingly, the Court must dismiss Count III of the Plaintiffs' Complaint under Rule 12(b)(6).

**3. CSRA (Count IV)**

Next, the Plaintiffs allege that they were targeted for removal, not terminated as part of an agency-wide RIF. They claim that USAID's "sham" RIF was a mere pretext for terminating them; that they were removed based on the administration's "claim[s] that [they] were engaged in actionable misconduct" and "perception that they were engaged in illegal activity[.]" Compl. ¶¶ 393–94. As the Plaintiffs tell it, the Defendants "openly expressed dissatisfaction with [their] perceived personal beliefs, expressed personal and political animus towards them, and wanted them removed from the Agency for reasons personal to them[.]" Compl. ¶ 385. But the Plaintiffs

[5] As the Defendants point out, "[a] public employee claiming retaliation for exercising her First Amendment rights" must succeed on a four-pronged balancing test. *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1176 (D.C. Cir. 2021); *see* Mot. at 30–31. The Plaintiffs' opposition does not attempt that showing, instead arguing that *Breiterman* is "inapplicable to a First Amendment claim[] for political discrimination and patronage." Opp'n at 27. In other words, the Plaintiffs have disclaimed—and therefore forfeited—any First Amendment retaliation claim.

offer no specific allegations to back up these conclusory assertions. They proffer no statements by the Defendants specifically singling them out for punishment—whether on grounds of ideology or of purported misconduct—nor any other reason to believe that they were treated any differently than other USAID employees whose positions were also eliminated.

Indeed, the exhibits attached to the Plaintiffs' own Complaint belie their sweeping allegations. The RIF notification received by Ms. Greene states that her "position and competitive area are being abolished" "to restructure USAID's operations to better reflect Agency priorities and the foreign policy priorities of the United States." Specific Notice of Reduction in Force, Pls.' Ex. 1 at 2, ECF No. 1-1. The notice further states: "This RIF action does not reflect on your service, performance, or conduct. It is being taken solely for the reason stated." *Id.* at 4. Of course, an agency's given reasons for terminating a federal employee are not dispositive at the pleading stage. *Cf. Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) (explaining in the Title VII context that "a plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight"). But the Complaint is otherwise devoid of any specific allegation that the Defendants singled out the Plaintiffs for disfavored treatment. And the Plaintiffs' own allegations of an agency-wide mass termination contradict their general claim that they were unlawfully terminated "for reasons personal to them[.]" Compl. ¶ 385. Because the Plaintiffs do not allege that the RIF was anything other than the mass termination that it purported to be, the Court must dismiss the Plaintiffs' claim that the RIF was a "sham" forbidden by the CSRA.

**4. Constitutional Due Process (Count V)**

Finally, the Plaintiffs allege that their terminations "imposed [a] badge of infamy, disqualified the Plaintiffs from any further Federal employment, damaged their prospects for private employment, and fixed upon them the stigma of an official defamation of character[]"—all in violation of constitutional due process guarantees. Compl. ¶ 407; *see also* Compl. ¶¶ 206, 393. Though the Plaintiffs do not expound on this theory, they appear to allege a "stigma-plus" due process claim. "A plaintiff makes out a stigma-plus claim when the government takes certain adverse actions *and* those actions create a stigma or other disability that foreclosed the plaintiff's freedom to take advantage of other employment opportunities[.]" *Campbell v. Dist. of Columbia*, 894 F.3d 281, 284 (D.C. Cir. 2018) (cleaned up). "The plaintiff must allege that this combination either formally or automatically excluded [her] from work on some category of future agency contracts or from other government employment opportunities or had the effect of broadly precluding [her] from pursuing her chosen career." *Langeman v. Garland*, 88 F.4th 289, 297 (D.C. Cir. 2023) (cleaned up). The D.C. Circuit has "further required that there be some statement of an attempt to obtain subsequent employment and a rejection for the job resulting from the alleged stigma or disability." *Id.*

The Complaint makes no attempt to plead this claim. Far from demonstrating a "formal[]" or "automatic[]" exclusion from future government employment, none of the Plaintiffs has alleged any efforts to obtain subsequent government employment. *Id.* And although the Defendants raised these arguments in seeking dismissal, *see* Mot. at 36–37, the Plaintiffs' opposition offers no response. Accordingly, the Court must dismiss the Plaintiffs' due process claim.

## CONCLUSION

For the foregoing reasons, the Court grants the Defendants' Motion to Dismiss, ECF No. 11. A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: November 6, 2026